# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KASSEM MAHMOUD HALLAK,

Defendant-Appellant.

FOR PUBLICATION
May 28, 2015
9:00 a.m.

No. 317863
Eaton Circuit Court
LC Nos. 12-020060-FH
       12-020070-FH
       12-020177-FH

Before: BOONSTRA, P.J., and SAAD and MURRAY, JJ.

MURRAY, J.

Defendant, a medical doctor, was convicted by a jury of his peers of second-degree criminal sexual conduct (CSC II), MCL 750.520c(1)(a) (sexual contact with victim under 13 years of age), third-degree criminal sexual conduct (CSC III), MCL 750.520d(1)(b) (sexual penetration by force or coercion), and six counts of fourth-degree criminal sexual conduct (CSC IV), MCL 750.520e(1)(b) (sexual contact by force or coercion). On appeal, defendant argues that the evidence was insufficient to support his CSC II conviction, that his sentence to lifetime electronic monitoring violates his state and federal constitutional rights against cruel and/or unusual punishment and double jeopardy, and that the trial court erred in utilizing facts not found by the jury in scoring the sentencing guidelines. For the reasons that follow, we reject each of defendant's arguments, and consequently affirm both his convictions and sentences.

## I. MATERIAL FACTS AND PROCEEDINGS

Defendant's CSC II conviction, the only conviction he challenges on appeal, is based on his improperly touching a twelve-year-old patient, SB. As a result, we will only recount the material facts presented at trial that are relevant to that conviction.

On March 30, 2010, 12-year old SB saw defendant for a medical exam. SB testified that while defendant was facing her with his back to the door and was either checking her throat with a tongue depressor, or was just holding the tongue depressor, he "cupped" her right breast for between 1 and 30 seconds with his left hand on the outside of her shirt. Defendant explained to SB that he was checking her breathing.

SB's mother, whom we will refer to as MB, testified that defendant's wife, Dr. Debbie Hallak, was SB's primary care doctor. Dr. Hallak's practice was on one side of the office; the

-1-

urgent care clinic operated by defendant was on the other side. MB testified that on March 30, 2010, SB, who had irritable bowel syndrome (among other conditions), saw defendant for stomach issues[1] at the urgent care clinic because Dr. Hallak was not available. MB explained that payment was always made before seeing a physician at this office but, on this day, there was a problem processing the insurance. As a result, MB dealt with the payment issue while a nurse obtained SB's height and weight before escorting her into an examination room. When MB finished with the insurance issue, she proceeded to the examination room, expecting to see Dr. Hallak with her daughter. When she walked in, MB saw defendant facing her daughter. His left hand held a stethoscope to SB's right side. However, his right hand was holding SB's left breast with the shirt and bra removed. According to MB, when she asked "what the hell he was doing," defendant left the room. When MB again asked defendant what he was doing, he asserted that MB was a bad mother because SB had not brushed her teeth. MB testified that defendant eventually said he had moved SB's bra because he could not hear her heart beat, and that Dr. Hallak subsequently told her that was normal or that it would not be anything to worry about if he moved the bra because the wire got in the way.[2]

For his part, defendant denied ever deviating from his policy of having a parent or guardian in the examination room when seeing a child, and specifically denied being alone with SB. Defendant testified that when he was examining SB's throat, he would have had the tongue depressor in one hand and a flashlight in the other; he denied fondling her breast, and denied that MB yelled at him about fondling her daughter's breast. He also denied examining SB with a stethoscope that day.

Dr. Grant Greenberg testified as a prosecution expert in family practice and addressed ethical and acceptable practices. Relative to SB, he opined that while it might be appropriate for a parent to leave the examining room so a minor could discuss something in private with the doctor, this would only be done if the parent agreed. According to Dr. Greenberg, it would not be medically ethical or acceptable to touch a patient's breast while examining her throat. Dr. Greenberg additionally noted that touching a patient's breast during this type of examination would be counterproductive given the additional tissue in that area, and that touching the breast while examining the patient's chest with a stethoscope was equally unnecessary, problematic and unethical.

Dr. Joseph Shufeldt testified as a defense expert in the area of urgent care, family practice in the urgent care setting, and ethical and acceptable medical practices. He agreed that there should be a chaperone with an 11- or 12-year-old minor unless the parent otherwise consents.

Along with this testimony that directly related to the touching of SB, the jury heard testimony from several witnesses who also claimed to have experienced similar treatment from

---

[1] The medical record indicated that SB presented with complaints of a sore throat, runny nose, cough, and vomiting.

[2] Dr. Hallak denied that MB had ever raised a concern with her regarding defendant touching her daughter inappropriately.

defendant while under his care.  Additionally, the jury heard the other victims testify in the cases consolidated with SB's.

After the jury's verdict, the trial court sentenced defendant to prison terms of 57 to 180 months for the CSC II conviction, 85 to 180 months for the CSC III conviction involving another victim, and 16 to 24 months for each CSC IV conviction also involving other victims.  The court additionally ordered lifetime electronic monitoring as part of defendant's CSC II sentence.  We now turn to defendant's arguments.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant seeks to overturn his CSC II conviction on the basis that his state and federal rights to due process of law[3] were violated because there was insufficient evidence on the intent element of the crime, i.e., that the touching of SB was for a sexual purpose.  The most that was established, according to defendant, was that he had noticed (and mentioned to MB) during an earlier abdominal examination that SB had pubic hair and that he had touched her breast while checking her breathing or examining her heart with a stethoscope.  Defendant maintains that touching of intimate body parts occurs often during such an examination and such intentional touching itself cannot establish a sexual purpose in this context.  Because there were no other actions or communications that suggested the purpose was sexual, and any actions and communications relative to other victims did not establish a sexual purpose as to SB, defendant asserts that there was insufficient evidence upon which to convict him.  According to defendant, upholding this conviction would put doctors in danger of CSC prosecutions for "virtually any physical examination."

In addressing this issue our task is to determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.  We resolve all conflicting evidence in favor of the prosecution, while acknowledging that circumstantial evidence and reasonable inferences may be sufficient to prove the elements of the crime. *People v Lockett*, 295 Mich App 165, 180; 814 NW2d 295 (2012).

MCL 750.520c(1)(a) establishes the crime of CSC II and proscribes sexual contact with a person under 13 years of age.  "Sexual contact" is statutorily defined to include "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching

---

[3] The United States Supreme Court—and subsequently the Michigan Supreme Court—have determined that the due process clause of the Fourteenth Amendment to the United States Constitution and Art 1, § 14 of the 1963 Constitution require that there be sufficient evidence to convict a defendant beyond a reasonable doubt. *Jackson v Virginia*, 443 US 307, 315; 99 S Ct 2781; 61 L Ed 2d 560 (1979); *In re Winship*, 397 US 358, 361-362; 90 S Ct 1068; L Ed 2d 368 (1970); *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

can reasonably be construed as being for the purpose of sexual arousal or gratification," MCL 750.520a(q), among other reasons. Defendant does not contest the victim's age or that there was sufficient evidence of a touching. Instead, as noted above, he argues only that the evidence failed to establish that the touching was intended for the purpose of sexual arousal or gratification.

"It is a well-established rule that a jury may convict on the uncorroborated evidence of a CSC victim." *People v Lemmon*, 456 Mich 625, 642 n 22; 576 NW2d 129 (1998); MCL 750.520h. Moreover, "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

Upon our review of the record, we hold that the evidence was sufficient to allow a jury to conclude that defendant did more than just touch SB's breast during a medical examination, and that it was for a sexual purpose. SB's testimony that defendant "cupped" her breast, coupled with MB's witnessing of the event and Dr. Greenberg's testimony that it would not be medically ethical or acceptable to touch a patient's breast while examining her throat, was sufficient for the jury to conclude that the touching was not for a legitimate medical purpose. If not for a medical purpose, the "cupping" was sufficient to give rise to an inference that it was for a sexual purpose, particularly in light of defendant's various explanations for the situation when confronted by MB. Accordingly, there was sufficient evidence to convict defendant of CSC II based on sexual contact with a person under the age of 13.

We likewise reject defendant's assertion that upholding his conviction could expose those in the medical field to unwanted CSC prosecutions for any sort of conduct occurring during a physical examination. First, the facts presented to the jury in defendant's case were not that of a routine medical exam. Defendant did not have a third person present during the examination of a minor, and two witnesses testified as to his "cupping" the minor's breast, and an expert testified that there was no medical reason to do so. Second, we firmly believe that between the objective screening charging procedures used by the prosecution, a trial court's ability to dismiss cases without factual support (see MCR 6.419), and a jury's keen ability to accurately determine the facts of a case, that there are sufficient protections within the system to avoid the concerns raised by defendant.

## B. JUDICIAL FACT-FINDING FOR SCORING PURPOSES

Defendant also argues that the scoring of the sentencing guidelines relative to his CSC III conviction violated his constitutional right to a jury trial[4] because a court cannot engage in judicial fact-finding when scoring the guidelines. Although there is a current split of opinion amongst some members of this Court regarding whether the rule in *Alleyne v United States*, 570 US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to the scoring of the sentencing guidelines, see the opinions issued in *People v Lockridge*, 304 Mich App 278; 849 NW2d 388

---

[4] US Const, Am VI.

(2014), lv granted 496 Mich 852 (2014), our Court has repeatedly concluded that *People v Herron*, 303 Mich App 392, 399; 845 NW2d 533 (2013),[5] controls this issue (and goes directly against defendant's position here) unless the Michigan Supreme Court says otherwise, and it has yet to do so. See, e.g., *People v Galloway*, 307 Mich App 151; 858 NW2d 520 (2014) (following *Herron*), held in abeyance ___ Mich ___; 861 NW2d 6 (2015), and *People v Duenaz*, 306 Mich App 85, 113-114; 854 NW2d 531 (2014) (following *Herron*). As defendant acknowledges, his argument on this point is precluded by our precedent.

## C. LIFETIME ELECTRONIC MONITORING

For someone convicted of CSC II where the victim is under the age of 13 and the perpetrator is over the age of 17, lifetime electronic monitoring, which will track defendant's movement and location until his death, is required by statute. MCL 750.520c(2)(b) and 750.520n(1). According to defendant, this "punishment" is cruel or unusual, both facially and, given that he has no prior record, as applied. Preserved constitutional questions like this one are reviewed de novo. *People v DiPiazza*, 286 Mich App 137, 144; 778 NW2d 264 (2009).

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003) (citation omitted). For his facial challenge to MCL 750.520c(2), defendant has the onerous burden to prove that there are no set of circumstances under which the statute is valid. *Bonner v City of Brighton*, 495 Mich 209, 223; 848 NW2d 380 (2014) (citations omitted); *Keenan v Dawson*, 275 Mich App 671, 680; 739 NW2d 681 (2007) (citation omitted). While the facial challenge standard is extremely rigorous, an as applied challenge is less stringent and requires a court to analyze the constitutionality of the statute against a backdrop of the facts developed in the particular case. *Keenan*, 275 Mich App at 680 (citation omitted).

A claim based upon the Eighth Amendment Cruel and Unusual Punishment Clause can also take two forms. Under an "as-applied" challenge a defendant can seek to overturn a sentence that is disproportionate "given all the circumstances in a particular case." *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). A defendant can also take a "categorical" approach by asserting that an entire class of sentences is disproportionate based upon the nature of the offense and the characteristics of the offender. *Id*. at 60.

MCL 750.520c(2) provides:

> Criminal sexual conduct in the second degree is a felony punishable as follows:

> (a) By imprisonment for not more than 15 years.

---

[5] Our Supreme Court has held the defendant's application for leave to appeal in *Herron* in abeyance pending its decision in *People v Lockridge*, 496 Mich 852 (2014). See *People v Herron*, 846 NW2d 924 (2014).

(b) In addition to the penalty specified in subdivision (a), the court shall sentence the defendant to lifetime electronic monitoring under section 520n if the violation involved sexual contact committed by an individual 17 years of age or older against an individual less than 13 years of age.

Under MCL 750.520n(1), a "person convicted under section 520b [CSC I] or 520c [CSC II] for criminal sexual conduct committed by an individual 17 years old or older against an individual less than 13 years of age shall be sentenced to lifetime electronic monitoring . . . ." Lifetime electronic monitoring involves "a device by which, through global positioning system satellite or other means, an individual's movement and location are tracked and recorded." MCL 791.285(3). The monitoring is to be in accord with MCL 791.285, which provides that the lifetime electronic monitoring program is to be established by the Department of Corrections ("DOC") and outlines what the program is to accomplish. Further, MCL 750.520n makes it a felony, punishable by imprisonment for not more than 2 years or a fine of up to $2,000, or both, if a person being monitored

(a) Intentionally removes, defaces, alters, destroys, or fails to maintain the electronic monitoring device in working order.

(b) Fails to notify the department of corrections that the electronic monitoring device is damaged.

(c) Fails to reimburse the department of corrections or its agent for the cost of the monitoring.

There is no provision in the statute for any kind of discretion, review, or relief from the required monitoring.

## A. CRUEL AND/OR UNUSUAL PUNISHMENT

Defendant first argues that lifetime electronic monitoring violates Const 1963, art 1, § 16, which prohibits "cruel *or* unusual punishment" (emphasis added) and US Const, Am VIII, which prohibits "cruel *and* unusual punishment" (emphasis added). Because of its broader language the Michigan prohibition potentially covers a larger group of punishments. *People v Carp*, 496 Mich 440, 519; 852 NW2d 801 (2014) (citation omitted). Under both provisions, however, the preliminary question is whether lifetime electronic monitoring constitutes a "punishment." *People v Costner*, ___ Mich App ___, ___; ___ NW2d ___ (2015), citing *In re Ayres*, 239 Mich App 8, 14; 608 NW2d 132 (1999).

We first address defendant's "as applied" challenge, for if this statute is valid under the facts applicable to defendant then it is certainly capable of being upheld against a facial challenge. See *Bonner*, 495 Mich at 223 (recognizing that a facial challenge will fail if any state of facts reasonably can be conceived that would sustain the statute). We also first consider it under the state constitutional prohibition because a statute upheld under our state governing charter's cruel or unusual punishment clause "necessarily passes muster under the federal constitution." *People v Nunez*, 242 Mich App 610, 618 n 2; 619 NW2d 500 (2000); see, also, *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011).

## 1. IS LIFETIME ELECTRONIC MONITORING A PUNISHMENT?

Defendant cites *People v Cole*, 491 Mich 325; 817 NW2d 497 (2012), for the proposition that lifetime electronic monitoring is punishment. There, the Court held that the defendant could withdraw his guilty plea where he was not advised that lifetime electronic monitoring would be part of the sentence, because lifetime electronic monitoring was a direct as opposed to a collateral consequence of the plea. The Court reasoned that lifetime monitoring was intended to be a punishment, and thus part of the sentence itself:

> Our conclusion that mandatory lifetime electronic monitoring is part of the sentence itself rests on the plain text of the relevant statutes. First, we note that our Legislature chose to include the mandatory lifetime electronic monitoring requirement in the penalty sections of the CSC-I and CSC-II statutes, and that both statutes can be found in the Michigan Penal Code, which describes criminal offenses and prescribes penalties.

> Second, both electronic-monitoring provisions provide that "the court *shall sentence* the defendant to lifetime electronic monitoring . . . ." MCL 750.520b(2)(d) and MCL 750.520c(2)(b) (emphasis added). The use of the directive "shall sentence" indicates that the Legislature intended to make lifetime electronic monitoring part of the sentence itself. Third, the CSC-II statute provides that the sentence of lifetime electronic monitoring is "[i]n addition to the penalty specified in subdivision (a)," MCL 750.520c(2)(b), and the CSC-I statute provides similarly that lifetime electronic monitoring is "[i]n addition to any other penalty imposed under subdivision (a) or (b)," MCL 750.520b(2)(d). The language "in addition to" indicates that the Legislature intended that lifetime electronic monitoring would itself be a penalty, in addition to the term of imprisonment imposed by the court.

> Finally, *our conclusion that the Legislature intended to make lifetime electronic monitoring a punishment* and part of the sentence itself is reinforced by MCL 750.520n(1), which likewise includes the language "shall be sentenced," and MCL 791.285(1) and (2), which use the language "individuals . . . who are sentenced . . . to lifetime electronic monitoring" and "[a]n individual who is sentenced to lifetime electronic monitoring . . . ."

> Accordingly, a plain reading of the relevant statutory text compels our conclusion that *the Legislature intended mandatory lifetime electronic monitoring to be an additional punishment* and part of the sentence itself when required by the CSC-I or CSC-II statutes. [*Cole*, 491 Mich at 335-336 (ellipses, brackets, and emphasis in original, except the emphasis in the third and fourth paragraphs).]

The prosecutor argues that the *Cole* Court's conclusion that mandatory lifetime monitoring is a punishment is obiter dictum because the Court could have reached the same result by simply noting that this was a regulatory scheme. But obiter dictum is a statement that is unnecessary to resolving a case, such as an extraneous statement made as an aside to the dispositive issue in an opinion. See *Auto-Owners Inc Co v All Star Lawn Specialists Plus, Inc*, 497 Mich 13, 21 n 15; 857 NW2d 570 (2014) (citation omitted). That the Court *could have* relied on an alternative

-7-

rationale does not make the Court's *chosen* rationale obiter dictum. Moreover, although the Court decided the question in the context of answering a different question, it nonetheless clearly concluded that lifetime electronic monitoring under this same statutory provision was intended by the Legislature to be a punishment. While it appears that the statute may have been primarily intended to help ensure that sex offenders would not encounter potential victims (a regulatory function), the *Cole* Court made it very clear that lifetime electronic monitoring is a punishment.

## 2. IS LIFETIME ELECTRONIC MONITORING A CRUEL OR UNUSUAL PUNISHMENT?

"In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011) (citation omitted); see, also, *People v Bosca*, ___ Mich App ___, ___; ___ NW2d ___ (2015), slip op at 26. However, the "dominant test" is the proportionality question, which is "whether the punishment is so excessive that it is completely unsuitable to the crime." *People v Coles*, 417 Mich 523, 530; 339 NW2d 440 (1983),[6] citing *People v Lorentzen*, 387 Mich 167, 176; 194 NW2d 827 (1972) (holding mandatory minimum prison sentence of 20 years for nonviolent crime of selling marijuana with no individualized consideration was cruel or unusual).

The goal of rehabilitation is also a consideration. *Di Piazza*, 286 Mich App at 154, citing *People v Launsburry*, 217 Mich App 358, 363; 551 NW2d 460 (1996). If the punishment "thwarts the rehabilitative potential of the individual offender and does not contribute toward society's efforts to deter others from engaging in similar prohibited behavior," it may be deemed excessive. *Coles*, 417 Mich at 530, citing *Lorentzen*. However, the "need to prevent the individual offender from causing further injury to society" is an equally important consideration. *Lorentzen*, 387 Mich at 180. In the end, a penalty that is unjustifiably disproportionate to the crime or unusually excessive should be struck down as cruel or unusual. See *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992).

Likewise, under a federal as-applied challenge a limited proportionality comparison also comes into play, as the court must first compare "the gravity of the offense and the severity of the sentence." *Graham*, 560 US at 60. This "narrow proportionality principle" does not require strict proportionality, but only prohibits "extreme sentences that are grossly disproportionate to the crime." *Id.*, at 87 (quotation marks and citation omitted). Because of that, and the significant deference given to legislative sentencing, it will be the rare case that meets this initial threshold test, *United States v Young*, 766 F3d 621, 625 (CA 6, 2014); *United States v Cobler*, 748 F3d 570, 575 (CA 4, 2014); *United States v Reingold*, 731 F3d 204, 211 (CA 2, 2013). Indeed, the Supreme Court has only found one non-life in prison law to meet this stringent test—a South Dakota law that provided for life in prison without parole for a recidivist defendant who passed bad checks. *Solem v Helm*, 463 US 277, 279-284; 103 S Ct 3001; 77 L Ed 2d 637 (1983). And,

---

[6] Our Supreme Court overruled *Coles*, in part, on other grounds in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

if a case does not meet that initial, narrow proportionality test, it can go no further. *Cobler*, 748 F3d at 575.

Turning now to the case before us, we first recognize that lifetime electronic monitoring for those convicted of CSC II against a victim less than 13-years-old[7] addresses the significant concerns of rehabilitation and recidivism. As the United States Supreme Court has repeatedly emphasized, "[t]he risk of recidivism posed by sex offenders is 'frightening and high.' " *Smith v Doe*, 538 US 84, 103; 123 S Ct 1140; 155 L Ed 2d 164 (2003), quoting *McKune v Lile*, 536 US 24, 34; 122 S Ct 2017; 153 L Ed 2d 47 (2002); see also *McKune*, 536 US at 33 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault") (citation omitted), *United States v Gould*, 568 F 3d 459, 472-473 (CA 4, 2009) ("Congress recognized that sex offenders constitute a unique class of criminal insofar as member of that class are considered to have higher rates of recidivism than other offenders") (citations omitted), and *Ohio v Ferguson*, 120 Ohio St 3d 7, 13; 896 NE2d 110 (2008). To combat these substantial recidivism risks, it has been recognized that "the monitoring system has a deterrent effect on would-be re-offenders" and "the ability to constantly monitor an offender's location allows law enforcement to ensure that the offender does not enter a school zone, playground, or similar prohibited locale." *Doe v Bredesen*, 507 F3d 998, 1007 (CA 6, 2007). It is against this backdrop that we look to the harshness of this punishment in light of other punishments and what other states have done. In so doing, we hold that defendant cannot overcome the presumption that his lifetime electronic monitoring requirement is neither cruel nor unusual.

In looking at the harshness of the penalty, the first comparison is of punishments for other crimes in this state. Defendant points out that lifetime electronic monitoring applies to both CSC I, which is punishable by life or any term of years, allows for consecutive sentencing, and has a 25-year mandatory minimum sentence if a child under the age of 13 is involved and mandatory life without parole if it is a second such offense, see MCL 750.520b(2), and CSC II, which is only punishable by up to 15 years in prison, MCL 750.520c(2). Further, he points out that the monitoring is not required for arguably more grave crimes, asserting that "one could kill another person, shoot them in the eye, hold them hostage, torture them, rob them with a weapon and forcibly penetrate an adult victim and not be subjected to lifetime electronic monitoring." All of this is true, but it also ignores the ancillary societal benefit of this life-long monitoring—to ensure that certain sex offenders will not again be in a position to exploit their potential victims—children, some of the most vulnerable in our society. *Gould*, 568 F3d at 472-473. The high recidivism rate and vulnerability of the victims are the common elements that allow for lifetime electronic monitoring in CSC II cases involving minor children, and which distinguishes these crimes from those defendant highlights. In other words, the factors that would allow for

---

[7] Our Court previously pointed out that lifetime electronic monitoring only applies to persons convicted of CSC I or CSC II when the victim is 13-years-old or less and the defendant is 17-years-old or older and is placed on parole or released from prison. See *People v Kern*, 288 Mich App 513, 521-523; 794 NW2d 362 (2010), and *People v Brantley*, 296 Mich App 546, 558-559; 823 NW2d 290 (2012).

the most pertinent comparison—a minor victim under the age of 13 with an offender 17 or older—is missing from these other crimes.[8]

Many states have imposed the penalty of lifetime electronic monitoring for various CSC cases. And while some of those states have imposed the requirement for a lesser amount of time, at least 12 (including Michigan) have mandated lifetime monitoring for defendants convicted of the most serious CSC offenses or CSC with a minor.[9] The "need to prevent the individual offender from causing further injury to society" is a valid consideration in designing a punishment, *Lorentzen*, 387 Mich at 180, and at least 11 states besides Michigan have determined that mandatory lifetime electronic monitoring is of value in ensuring such protection. Defendant suggests that this is the case only for more serious sexual offenses, but sexual offenses involving children under 13 years of age are grave offenses and, given the judicially recognized

---

[8] While the harshness of the penalty is the mainstay of defendant's argument, he also argues that the relative gravity of this offense does not warrant lifetime electronic monitoring. He notes that it "applies equally to the high school offender [over 17 years old] who pats the behind of a young girl and the recidivist adult offender engaged in a forced act of penetration." However, it would only apply in the first instance if the touching were for a sexual purpose and in all instances only if the touching was of a child under the age of 13. More importantly, sexual abuse of children under the age of 13 is a grave offense in all instances.

[9] See Cal Penal Code § 3004(b) (providing that every inmate convicted of certain "registerable sex offenses . . . shall be monitored by a global positioning system for life"); Ga Code Ann § 42-1-14(e) (2011) (requiring "[a]ny sexually dangerous predator . . . to wear an electronic monitoring system" linked to a global positioning satellite "for the remainder of his or her natural life"); Kan Statutes Ann, § 21-6604(r) (requiring certain sexual offenders to "be electronically monitored upon release from imprisonment for the duration of the defendant's natural life"); La RS 15:560.4 (a "violent sexual predator or a child sexual predator . . . shall be required to be electronically monitored . . ."); Md Code Ann, Crim Proc § 11-723 ("The conditions of lifetime sexual offender supervision may include . . . monitoring through global positioning satellite tracking or equivalent technology"); Mo Rev Stat § 217.735 ("A mandatory condition of lifetime supervision of [certain sexual offenders] . . . is that the offender be electronically monitored. Electronic monitoring shall be based on a global positing system or other technology that identifies and records the offender's location at all times"); Mont Code Ann, 46-23-1010 (providing for "the continuous, satellite-based monitoring of [certain] sexual offenders"); Neb Rev Stat 83-174.03 (requiring certain sexual offenders to be supervised "for the remainder of his or her natural life" through certain conditions, including those "designed to minimize the risk of recidivism, including, but not limited to, the use of electronic monitoring which are not unduly restrictive"); NC Gen Stat § 14-208.40A(c) ("If the court finds that the offender has been classified as a sexually violent predator [or] is a recidivist . . . the court shall order the offender to enroll in a satellite-based monitoring system for life"); RI Gen Laws § 11-37-8.2.1 (certain sexual offenders "shall be electronically monitored via an active global positing system for life . . . "); Wis Stat § 301.48 (requiring "lifetime tracking" of certain sexual offenders through "a global positioning system . . . that is required . . . for the remainder of the person's life . . . .").

recidivism rate for these offenders, this level of protection is not clearly excessive or grossly disproportionate. It is certainly not unusual. And, it is not grossly disproportionate with respect to defendant. Although he had no prior record, there was evidence of improper sexual acts involving 13 women or children. Such evidence suggests that lifetime monitoring would help to protect potential victims from defendant, who in turn would likely be deterred from engaging in such acts if he were closely monitored. Accordingly, when employing an as applied standard under the state constitution, lifetime electronic monitoring is not cruel or unusual punishment.[10]

For these same reasons, defendant cannot succeed on his facial challenge under the state constitution, *Bonner*, 495 Mich at 223, nor can he prevail on his federal constitutional claim, *Nunez*, 242 Mich App at 204. And, even if defendant's federal claim were not essentially subsumed within the stricter state constitutional provision, our analysis reveals that lifetime electronic monitoring is not an "extreme sentence" that is "grossly disproportionate to the crime." *Graham*, 560 US at 59-60. Lifetime electronic monitoring for an individual 17 or older who is convicted of criminal sexual conduct against an individual 13 or younger is not the least bit comparable to the only crime and non-life in prison punishment found to be unconstitutional by the Supreme Court. That part of defendant's sentence there does not violate either defendant's state or federal rights against cruel and/or unusual punishment.

## B. FOURTH AMENDMENT

Defendant cites *United States v Jones*, __ US __; 132 S Ct 945; 181 L Ed 2d 911 (2012), for the proposition that electronic monitoring violates the Fourth Amendment to the United States Constitution. US Const, Am IV provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Jones*, the police attached a GPS device to a vehicle belonging to the defendant's wife and tracked his movements for 28 days. According to the Court, whether placing the GPS device on defendant's car constituted a search did not turn on whether the defendant had a reasonable expectation of privacy in the underbelly of the vehicle or its location on public roads. *Id.* at 950. Instead the Court held that because "the Government physically occupied private property for the purpose of obtaining information," *id.* at 949, it had engaged in a search, *id.* The Court therefore did not reach the question whether the search violated defendant's reasonable expectation of privacy. *Id.* at 954; see also *People v Gingrich*, 307 Mich App 656, 663-664; ___ NW2d ___ (2014) (recognizing that there is no need to determine the reasonable expectation of privacy if

---

[10] Defendant mentions in passing that the mandatory statutory costs for the lifetime electronic monitoring also is cruel or unusual punishment. But defendant provides no argument in support of this particular position, so the pump has not been primed for the appellate well to flow. *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009).

the government physically intrudes on the defendant's property or person, as the intrusion for purposes of gathering information constitutes a search by itself).

Though neither party has brought the decision to our attention, whether placing the monitor on defendant constitutes a search for purposes of the Fourth Amendment was just recently resolved by the United States Supreme Court in *Grady v North Carolina*, ___ US ___; 135 S Ct 1368; ___ L Ed 2d ___ (2015). There, the Court held a Fourth Amendment search occurred through operation of a North Carolina law that required recidivist sex offenders to wear a satellite monitoring device. *Id*. at 1369-1370. On the basis of *Grady*, we must hold that the placement of an electronic monitoring device to monitor defendant's movement constitutes a search for purposes of the Fourth Amendment. But, as the *Grady* Court also noted, that conclusion does not end the Fourth Amendment inquiry, as the Fourth Amendment only precludes *unreasonable* searches. *Id*. at 371. Whether a search is unreasonable is a question of law. *Sitz v Dep't of State Police*, 443 Mich 774, 765; 506 NW2d 209 (1993), citing *People v Case*, 220 Mich 379; 190 NW 289 (1922). Accord: *United States v Wagers*, 452 F3d 534, 537 (CA 6, 2006) and *United States v Taylor*, 592 F3d 1104, 1107 (CA 10, 2010). For the following reasons, we hold that lifetime electronic monitoring for a defendant 17 years or older convicted of CSC II involving a minor under 13 is not unreasonable.

The reasonableness of a search "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v Montoya de Hernandez*, 473 US 531, 537; 105 S Ct 3304; 87 L Ed2d 381 (1985) (citation omitted). " 'The applicable test in determining the reasonableness of an intrusion is to balance the need to search, in the public interest, for evidence of criminal activity against the invasion of the individual's privacy.' " *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009), quoting *People v Watkins*, 267 Mich App 728, 733; 705 NW2d 728 (2005).

Turning first to the public interest, it is evident that in enacting this monitoring provision the Legislature was seeking to provide a way in which to both punish and deter convicted child sex offenders and to protect society from a group known well for a high recidivist rate. As the Court pointed out in *Samson v California*, 547 US 843, 853; 126 S Ct 2193; 165 L Ed 2d 250 (2006), "this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." See also *Smith*, 538 US at 103. "This Court has acknowledged the grave safety concerns that attend recidivism," *Samson* continues, and that "the Fourth Amendment does not render the States powerless to address these concerns effectively." *Samson*, 547 US at 854. As the prosecutor points out, electronic monitoring not only acts as a strong deterrent, but also assists law enforcement efforts to ensure that these individuals, who have committed " 'the most egregious and despicable of societal and criminal crimes,' " *United States v Mozie*, 752 F3d 1271, 1289 (CA 11, 2014), quoting *United States v Sarras*, 575 F3d 1191, 1220 (CA 11, 2009), do not frequent prohibited areas (elementary schools, etc.) and remain compliant with the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., see *Doe*, 507 F3d at 1007. Consequently, when enacting this monitoring system and requiring it only for those 17 or older who commit criminal sexual conduct against children under the age of 13, the Legislature was addressing punishment, deterrence and protection of some of the most vulnerable in our society against some of the worst crimes known. As we earlier noted, the "need to prevent the

individual offender from causing further injury to society," *Lorentzen*, 387 Mich at 180, is a valid consideration in designing a punishment, *id*.

Having examined the public interest in this type of monitoring, we now balance that interest against the invasion of defendant's privacy interest. We begin by recognizing that parolees and probationers have a lower expectation of privacy, even in the comfort of their own homes, than does the average law abiding citizen. *Samson*, 547 US at 848-852; *Hudson v Palmer*, 468 US 517, 530; 104 S Ct 3194; 82 L Ed 2d 393 (1984). The monitoring does not prohibit defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes. Instead, the monitoring device simply records where he has traveled to ensure that he is complying with his terms of probation and state law. MCL 791.285(1) and (3). And, although this monitoring lasts a lifetime, the Legislature presumably provided shorter prison sentences for these CSC II convictions because of the availability of lifetime monitoring. In that regard we also cannot forget that minor victims of CSC II are often harmed for life. See *Mozie*, 752 F3d at 1289 ("Sexual crimes against minors cause substantial and long-lasting harm . . . "), *Kennedy v Louisiana*, 554 US 407, 467-468; 128 S Ct 2641; 171 L Ed 2d 525 (2008) (ALITO, J., dissenting) (discussing the long term developmental problems sexually abused children can experience) (citation omitted), and *People v Huddleston*, 212 Ill 2d 107, 135; 816 NE2d 322 (2004) ("The child's life may be forever altered by residual problems associated with the event") (citations omitted). Though it may certainly be that such monitoring of a law abiding citizen would be unreasonable, on balance the strong public interest in the benefit of monitoring those convicted of CSC II against a child under the age of 13 outweighs any minimal impact of defendant's reduced privacy interest.

## C. DOUBLE JEOPARDY

Finally, defendant argues that the punishment of lifetime electronic monitoring, and concomitant cost, violate the state and federal Double Jeopardy Clauses. Article 1, Section 15 of our Constitution provides, in pertinent part, that "[n]o person shall be subject for the same offense to be twice put in jeopardy," Const 1963, art 1, § 15, whereas the Fifth Amendment to the United States Constitution provides, in pertinent part, that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," US Const, Am V. The double jeopardy prohibition "(1) [] protects against a second prosecution for the same offense after acquittal; (2) [] protects against a second prosecution for the same offense after conviction; and (3) [] protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 575; 677 NW2d 1 (2004) (citations omitted). However, with respect to multiple punishments, this Court in *People v Ford*, 262 Mich App 443, 447-448; 687 NW2d 119 (2004) (some citations omitted), stated:

> [T]he purpose of the double jeopardy protection against multiple punishments for the same offense is to protect the defendant from having more punishment imposed than the Legislature intended. [*People v Sturgis*, 427 Mich 392, 399; 297 NW2d 783 (1986), citing *People v Calloway*, 469 Mich 448, 451; 671 NW2d 733 (2003).] "The Double Jeopardy Clause acts as a restraint on the prosecutor and the courts, not the Legislature" [*People v Robideau*, 419 Mich 458, 469; 355 NW2d 592 (1984), overruled on other grounds in *People v Smith*, 478 Mich 292, 315; 733 NW2d 351 (2007), citing *Brown v Ohio*, 432 US 161; 97 S Ct 2221; 53 L Ed 2d 187 (1977). Accordingly, the Double Jeopardy Clause

does not limit the Legislature's ability to define criminal offenses and establish punishments, *Sturgis*, *supra* at 400, and the "only interest of the defendant is in not having more punishment imposed than that intended by the Legislature," *Robideau*, *supra* at 485.

See also *People v Dewald*, 267 Mich App 365, 384-385; 705 NW2d 167 (2005) (where the defendant was sentenced to prison and ordered to pay restitution, and "MCL 780.766(2) requires a court to order restitution 'in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law . . . ,' " the order of restitution did not violate double jeopardy), abrogated on other grounds, *People v Melton*, 267 Mich App 365; 705 NW2d 167 (2005).

Because the Legislature intended that both defendant's prison sentence and the requirement of lifetime monitoring be sanctions for the subject crime, there was no double jeopardy violation.

Affirmed.

/s/ Christopher M. Murray
/s/ Mark T. Boonstra
/s/ Henry William Saad