*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
April 7, 2022

v

DAVONTE LARON WATSON,

Defendant-Appellant.

No. 347309
Wayne Circuit Court
LC No. 18-004118-01-FJ

Before: GADOLA, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a bench trial, of one count of first-degree criminal sexual conduct ("CSC-I"), MCL 750.520b(1)(a) (sexual penetration of a person under age 13), and two counts of second-degree criminal sexual conduct ("CSC-II"), MCL 750.520c(1)(a) (sexual contact of a person under age 13).[1] The trial court sentenced defendant to 10 to 25 years' imprisonment for the CSC-I conviction and 2 to 15 years' imprisonment for each CSC-II conviction, to be served concurrently. Additionally, in conjunction with his CSC-I conviction, defendant was sentenced to lifetime electronic monitoring. We affirm.

The complainant, KDM, testified that defendant, to whom KDM referred as her uncle, sexually assaulted her on four separate occasions when she was approximately six to nine years old. According to KDM, three of the incidents happened in defendant's bedroom, on the bottom bunk bed, and involved defendant rubbing the outside of her genital area with his hand. KDM described a fourth incident when she was in the bathroom and defendant put his penis in her mouth. She described that something white came out of defendant's penis and went into the toilet. Defendant testified at trial and denied any sexual misconduct. He also called other witnesses who

---

[1] After the close of the prosecution's proofs, the trial court granted defendant's motion for directed verdict on two other counts of CSC-I. This was a consolidated trial involving two minor complainants, HW and KDM. The trial court directed a verdict of acquittal on the one (and only) count pertaining to HW, and on one of the counts pertaining to KDM. This appeal only pertains to the charges involving KDM.

claimed that when KDM was questioned about the allegations, she either denied or failed to admit any sexual misconduct by defendant.

The trial court acknowledged that the case was a credibility contest. It found that the defense witnesses were biased and not credible. Conversely, it found KDM to be credible and, on the basis of her testimony, found defendant guilty of CSC-I and two counts of CSC-II.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support his convictions of CSC-I and CSC-II. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo by viewing the evidence in a light most favorable to the prosecution to determine whether "any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007) (quotation marks and citation omitted). "All conflicts with regard to the evidence must be resolved in favor of the prosecution. Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005). This Court does not resolve credibility issues anew on appeal. *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998); see also *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"The elements of CSC-I under MCL 750.520b(1)(a) are that (1) the defendant engaged in sexual penetration with another person and (2) the other person was under 13 years of age." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). "Sexual penetration" includes fellatio. MCL 750.520a(r).

Regarding CSC-II, MCL 750.520c(1)(a) provides:

(1) A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists:

(a) That other person is under 13 years of age.

"Sexual contact" is defined in pertinent part as "the intentional touching of the victim's or actor's intimate parts." MCL 750.520a(q). And "intimate parts" is defined as "the primary genital area, groin, inner thigh, buttock, or breast of a human being." MCL 750.520a(f).

Defendant does not dispute that KDM's testimony, if believed, established that defendant was guilty of one count of CSC-I and two counts of CSC-II. Indeed, defendant acknowledges that "[t]his case was a one-on-one credibility contest." Instead, he argues that KDM's testimony was too "vague and uncorroborated . . . to overcome [defendant's] credible testimony denying abuse." First, defendant misconstrues the proper standard in a challenge to the sufficiency of the evidence. Any conflicts in the evidence are to be resolved in favor of the prosecution. *Wilkens*, 267 Mich App at 738. Thus, the fact that KDM's testimony was "uncorroborated," or even flat-out contradicted, is of no moment. Moreover, KDM's testimony was not vague. KDM testified that

on three separate occasions defendant touched the outside of her genital area with his hand and on one occasion, he put his penis in her mouth. KDM also testified that she was only 12 years old at the time of trial, establishing that she was under the age of 13 at the time of the incidents. This was sufficient to support defendant's convictions of CSC-I and CSC-II.

Defendant also argues that there was insufficient evidence to support his conviction for Count 4, CSC-II. Defendant contends that the prosecutor amended this count at the preliminary examination to allege "penis to the outside of the vagina" sexual contact and that because there was no evidence of any penile-vaginal contact, this count should have been dismissed. We hold that defendant is not entitled to reversal on this count.

The information before the preliminary examination reflected three counts: Count 1—CSC-I for fellatio; Count 2—CSC-I for penis in genital opening; and Count 3—CSC-II for unspecified sexual contact. At the preliminary examination, KDM was the only witness and described *four* instances of defendant sexually assaulting her. Because only three counts were initially listed, the prosecution moved to add a fourth count. Regarding this fourth incident of CSC, KDM testified that defendant touched the outside of her genital area with his penis. She said that defendant was behind her and that she was lying face down on the bed when this occurred.

It is apparent that this added fourth count was in relation to defendant's actions while KDM was lying on the bed. At trial, KDM testified that defendant assaulted her while she was lying on the bed. Thus, the same "transaction" that was referenced at the preliminary examination was referenced at trial. We acknowledge that the details of this transaction differed between what was described at the preliminary examination and at trial. KDM testified at the preliminary examination that she was lying face down on the bed at the time of the assault, whereas at trial she said that she was lying face up. Additionally, at the preliminary examination, KDM testified that defendant touched her genital area with his penis, whereas at trial she said that defendant touched her with his hand. But notably, because the amended information did not detail the type of contact involved, amendment would have been unnecessary. In other words, there was no reason to amend the information because there was nothing to correct in that document regarding Count 4. The information provided that Count 4 involved CSC-II, i.e., "sexual contact," with KDM, and that is what the proofs showed at trial.

In any event, MCL 767.76 states, in pertinent part:

[No] conviction [shall] be set aside or reversed on account of any defect in form or substance of the indictment, unless the objection to such indictment, specifically stating the defect claimed, be made prior to the commencement of the trial or at such time thereafter as the court shall in its discretion permit.

Similarly, MCR 6.112(G) provides:

Absent a timely objection and a showing of prejudice, a court may not dismiss an information or reverse a conviction because of an untimely filing or because of an incorrectly cited statute or a variance between the information and proof regarding time, place, the manner in which the offense was committed, or other factual detail relating to the alleged offense.

Initially, defendant never raised any objection related to the contents of the information in the trial court, precluding relief. Moreover, defendant's assertion on appeal that he was prejudiced because he was convicted of a crime for which he was not charged is inaccurate. As already discussed, the information provided that defendant had engaged in CSC-II with KDM for Count 4, and that is what the proofs at trial supported. Any variances between how the information presented Count 4 (as purportedly reflected by the evidence introduced at the preliminary examination) and how the count was proven at trial is insufficient to reverse defendant's conviction. MCR 6.112(G); see also *People v Waclawski*, 286 Mich App 634, 707; 780 NW2d 321 (2009).[2] Defendant was fully aware going into trial that he had to defend against four counts of CSC as to KDM, with one of those counts pertaining to his alleged sexual touching of KDM while she was lying on the bed in his bedroom. Accordingly, he knew the particular incident that was the basis for that count and cannot show any prejudice. The fact that there were factual differences in KDM's testimony between the preliminary examination and trial on how that touching occurred does not mean that defendant was denied notice of the charged conduct.

## II. VERDICT AGAINST GREAT WEIGHT OF EVIDENCE

Defendant also avers that the verdict was against the great weight of the evidence. We again disagree.

To determine whether the verdict in a bench trial is against the great weight of the evidence, this Court reviews the trial court's findings of fact for clear error, while deferring to the trial court's credibility determinations. *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 651-652 & n 14; 662 NW2d 424 (2003). "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011). But "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). The Court then must determine "whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Musser*, 259 Mich App 215, 218-219; 673 NW2d 800 (2003). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998).

The evidence does not preponderate so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. KDM's testimony clearly supported the verdict. The only evidence weighing against the verdict was defendant's own testimony. The primary other evidence introduced in favor of defendant was evidence impeaching KDM. But the fact that KDM's testimony was impeached is inadequate to warrant a new trial. See *id*. It also is important to recognize that the trial court expressly found that KDM was credible and that the defense witnesses were not credible. Because credibility determinations are reserved for the fact-finder, this typically would end the analysis. But defendant further argues that the trial court's reasons for finding KDM credible were lacking in logic or based on illegal principles.

---

[2] Defendant also failed to file any objection regarding the information in the trial court, precluding any relief. See MCR 6.112(G).

The trial court recognized that KDM's credibility was the key to the entire case. The court provided several reasons why it found KDM credible, stating:

There was no evidence that [KDM] was coached by an adult. In fact, neither of her parents [testified]. There was no evidence that she had made inconsistent statements during the forensic interview at Kids-TALK, to the Child Protective Services, to the staff at the hospital. Or even when she testified at the preliminary exam.

She has nothing to gain. Or a motive to lie. In fact, [she] disclosed four times before Child Protective Services came into the picture.

If the argument is that she and [HW] made this all up, then she would have backed [HW's] story up and said, that she was in the bathroom with [HW] when [HW] claimed that the defendant sexually abused her. But she didn't.

Young children make perfect victims because they're often not believed and many times they don't tell.

It would be one thing if one child had made an accusation. It's another thing when it's two. If only the walls at 15034 Rosemont could talk.

I found [KDM] to be credible. And her testimony proved that the defendant made her perform fellatio and that he intentionally touched her genital area when she was under the age of thirteen beyond a reasonable doubt.

Defendant takes exception to several of the court's proffered reasons.

Defendant first asserts that it was impermissible for the court to have relied on the fact that both HW and KDM made allegations against defendant ("It would be one thing if one child had made an accusation. It's another thing when it's two."). Defendant is correct that this reference is puzzling because the trial court previously granted defendant's motion for a directed verdict of acquittal on the one count pertaining to HW because it found her not credible.[3] Defendant argues that such reliance on acquitted conduct is impermissible under *People v Beck*, 504 Mich 605; 939 NW2d 213 (2019). In *Beck*, the Supreme Court held that "due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *Id*. at 629. *Beck* is not directly on point because it addressed factual findings at sentencing that were contrary to acquitted conduct from the trial. Regardless, the main problem

---

[3] Although not before us, it appears that the trial court committed a clear legal error by granting defendant's motion for a directed verdict on the count related to HW. The court found HW's testimony not credible "in light of the contradicting testimony and the fact that there is no evidence to corroborate" her testimony. But that is not a proper consideration at the directed-verdict stage. See *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997) ("[I]t is not permissible for a trial court to determine the credibility of witnesses in deciding a motion for a directed verdict of acquittal, no matter how inconsistent or vague that testimony might be.").

with relying on *Beck* in this instance is that the trial court here did not make any express finding that was contrary to acquitted conduct. While the court acquitted defendant of committing CSC-I against HW, the court never later expressly found that defendant had in fact sexually penetrated her. Thus, the trial court's apparent reliance on HW's allegations to find that KDM was credible, although somewhat illogical on its face, does not implicate the due-process concerns raised in *Beck*.

Defendant next argues that the trial court improperly relied on the fact that KDM had "disclosed four times before Child Protective Services [CPS] came into the picture." Defendant does not dispute that there was evidence to support the court's finding that KDM had made four disclosures before CPS became involved. Thus, the trial court's finding is not clearly erroneous. Instead, defendant asserts that the purported disclosures were inadmissible hearsay that should not have been considered. That evidentiary issue was not raised in the trial court and therefore is unpreserved. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Furthermore, this evidentiary issue is not listed in defendant's statement of the questions presented in his brief on appeal. The question presented for this topic only raises a sufficiency claim and a great-weight of the evidence claim. Therefore, we deem this evidentiary issue abandoned. See MCR 7.212(C)(5); *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993).

Defendant also argues that the trial court impermissibly shifted the burden to the defense to disprove the allegations. We again disagree. The trial court commented that, among the reasons to find KDM credible, were the following: (1) there was no evidence that KDM had been coached; (2) there was no evidence that she made inconsistent statements at Kids-TALK, to CPS, to the hospital staff, or at the preliminary examination; (3) she had no motive to lie; and (4) if she and HW had conspired to make the allegations, she would have supported HW's claim that defendant sexually assaulted HW in KDM's presence. Defendant is correct that he was under no obligation to present any evidence to counter the prosecution's case. See *People v Gaydosh*, 203 Mich App 235, 239; 512 NW2d 65 (1994). However, the trial court did not shift any evidentiary burden. The court was simply commenting on the evidence presented. The court commenting on the lack of impeaching evidence is akin to commenting that evidence is "uncontradicted" or "undisputed." And noting that evidence is uncontradicted, even if the defendant was the only person who could have contradicted or challenged the evidence, does not impermissibly shift the burden to the defendant. *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995); *People v Godbold*, 230 Mich App 508, 521; 585 NW2d 13 (1998). Therefore, the trial court did not err by recognizing the lack of impeaching evidence in the record.

In sum, defendant's great-weight argument seems to be a challenge to the trial court's credibility determination of KDM, which generally is not allowed because this Court defers to the trial court's credibility determinations. *Ambs*, 255 Mich App at 652. Moreover, to the extent that the trial court's credibility determination is reviewable, we are not left with a definite and firm conviction that the trial court made a mistake. Although the court's reliance on HW's allegations in support of finding KDM credible is somewhat puzzling, due process was not implicated. The trial court was able to view and assess KDM's testimony in real time, see MCR 2.613(C), and the other reasons the court noted for finding KDM credible were reasonable.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the right to the effective assistance of counsel. We disagree. Claims of ineffective assistance of counsel involve a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Effective counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eloby (After Remand)*, 215 Mich App 472, 476; 547 NW2d 48 (1996). Generally, to establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

### A. FAILURE TO OBJECT TO BOLSTERING HEARSAY

Defendant first argues that trial counsel was ineffective by failing to object to bolstering hearsay. Defendant claims that counsel should have objected to KDM's testimony that she told her mother about the abuse when she was six years old and again when she was seven or eight. Defendant also asserts that trial counsel should have objected to KDM's testimony that when she was 11 years old, she told her father's friends, her father, a nurse, and a person at Kids-TALK about the abuse. The premise for defendant's position is that the testimony regarding these disclosures was inadmissible hearsay. However, KDM never repeated any actual statements to these individuals. Because no actual "statements" were offered into evidence, the bar against hearsay is not applicable. See MRE 801(a) and (c) (defining hearsay as including a "statement"); MRE 802. Moreover, to the extent that the references to these prior incidents could be considered "statements," they were not offered to prove the truth of the matter asserted. See MRE 801(c) (defining "hearsay" as an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement"). In other words, KDM's disclosures to others were not offered as substantive evidence that defendant had sexually assaulted KDM; they instead were offered to explain why there was a delay in KDM being evaluated and charges being filed. Therefore, defense counsel's failure to object to these references in KDM's testimony was not unreasonable. Further, assuming it was improper for counsel not to raise any objection, the error did not have a reasonable probability of affecting the outcome of the trial. As our Supreme Court has recognized, "Michigan law provides that where a hearsay statement is not offered and argued as substantive proof of guilt, but rather offered merely to corroborate the child's testimony, it is more likely that the error will be harmless." *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010).

### B. FAILURE TO IMPEACH WITH HOSPITAL RECORD

Defendant next argues that trial counsel was ineffective by failing to impeach KDM with a record from her visit to the hospital. While this is a closer issue, we hold that any error in this regard did not have a reasonable probability of affecting the outcome of the case.

At issue is a hospital record, which defense counsel was aware of and had possession of, describing KDM's visit to the hospital after she disclosed the allegations to her father. The hospital record states, in pertinent part:

> This is an 11-year-old female who comes in who disclosed to her father yesterday that her uncle touched her with his hands from age of 6 until 9. She states that it has not happened for the last 2 years. She denied any other penetration. She denies any oral contact, any vaginal contact. She does state that he touched her only with his hand. She denies any contact with his penis at all.

Defendant asserts that it was unreasonable for counsel to not introduce this statement because it would have contradicted KDM's testimony that defendant put his penis in her mouth. At a posttrial evidentiary hearing, the prosecution conceded that it was objectively unreasonable for defense counsel not to use this evidence for impeachment, especially in light of counsel's comment during his opening statement, when he stated, "In the emergency record that, you will see some of the records that indicates the allegations at that time. And the accusations were just of a touching. No penetration." We agree that given the nature of the content of the note and counsel's expressed intention to introduce the note into evidence, it was objectively unreasonable not to use the hospital record to impeach KDM's testimony.

However, we conclude there is not a reasonable probability that the outcome would have been different had the record been introduced at trial. The fact that KDM denied any contact with defendant's penis or denied that any penetration occurred was in the context of the allegation of *defendant touching her genital area*. Those denials, by themselves, do not relate to the allegations at trial of penile-mouth contact. The salient part of this hospital record is that it supports that the only allegation of sexual assault KDM made at the hospital was defendant touching KDM's genital area with his hands. As a result, it tends to impeach KDM's later testimony that defendant also put his penis in her mouth. However, the nurse was questioning KDM on the basis of the allegations presented by KDM's father.[4] It appears from the hospital record at issue that KDM's father only informed the hospital that KDM had been "touched." The father did not testify, so it is unclear why he only relayed touching allegations to the hospital, but the most likely explanation is that KDM had not yet told him about defendant placing his penis in her mouth.[5] Notably, at trial KDM never explained in detail what she told her father, let alone what she told him initially.[6] Therefore, although the hospital record undoubtedly has impeachment value, we are not convinced that it would have carried significant weight. We therefore conclude that there is not a reasonable

---

[4] KDM's father was identified as the "historian" in the report.

[5] While KDM may have ultimately disclosed more to her father, it is noteworthy that he first learned of the allegations the previous day. Defendant's own expert acknowledged that children often will reveal incidents of sexual abuse piecemeal.

[6] KDM answered in the affirmative when asked if she "ever" told her father, she agreed that she told her father "these things," and agreed that she "discussed these events" with her father.

probability that counsel's failure to introduce the hospital record affected the outcome of the proceedings.

## C. FAILURE TO IMPEACH WITH PRELIMINARY EXAMINATION TESTIMONY AND FORENSIC INTERVIEW

Next, defendant argues that trial counsel was ineffective by failing to impeach KDM with her preliminary examination testimony and her statements from her Kids-TALK interview. Decisions about what evidence to present are matters of trial strategy that this Court will not second guess. *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Defendant contends that counsel should have impeached the following aspects of KDM's trial testimony.[7]

At trial, KDM testified that defendant never locked the bedroom door before assaulting her, but she said during her Kids-TALK interview that it was defendant's routine to lock the door beforehand. While this was a valid inconsistency that could have been highlighted, it was not objectively unreasonable to not do so. Even defendant acknowledges that trial counsel is not obligated to impeach every inconsistency. Whether the door was locked every time did not speak to the heart of the matter, which was whether defendant sexually assaulted KDM. Also, bringing up KDM's prior statement about defendant locking the door ran the risk that it would have refreshed her memory and caused her to recall that this is what happened. Evidence that defendant locked the door each time arguably could have put him in a worse light because it could show premeditation and consciousness of guilt. Thus, it was reasonable for defense counsel to forgo impeaching KDM's testimony that the doors were not locked with her prior statement that defendant did lock the doors each time.

Defendant next notes that KDM testified at trial that she never saw defendant abuse HW, but that during her forensic interview at Kids-TALK, KDM stated that defendant abused both of them, one right after another in his room.[8] Defendant apparently believes that defense counsel

---

[7] In detailing how trial counsel should have impeached KDM's trial testimony, defendant makes the curious observation that KDM's preliminary examination testimony was inconsistent with one of her statements from the Kids-TALK interview on the topic of whether the volume was on or not while watching pornographic movies that defendant had showed her. But defendant does not identify how the fact that the preliminary examination testimony was inconsistent with the Kids-TALK interview was pertinent. Put another way, defendant has not identified any *trial* testimony to impeach with respect to this matter. Counsel cannot be deemed ineffective for not attempting to impeach KDM's preliminary examination testimony at trial.

[8] The pertinent portion of the Kids-TALK interview is the following:

> *Q*. Can you tell me all about that time [that HW was in the room with you and defendant]?

> *A*. He would lay her on the bed, he would pull her panties and pants down and then he would start rubbing her vagina and then that's when she would pull her

should have used the Kids-TALK interview to impeach KDM's trial testimony that she never saw defendant abuse HW. While highlighting the inconsistency could have made the witness seem unreliable, there was also a risk that the witness might "recall" the incident as recounted during the Kids-TALK interview and affirm the prior statement's accuracy. The severity of this risk clearly outweighs any benefit that might have been gained by pointing out this inconsistency in the witness's testimony concerning abuse of another child.

Lastly, defendant notes that KDM testified at trial that she was six years old when she told her mother after the first incident, but she testified at the preliminary examination that she told her mother after the second time she was abused and did not recall how old she was. But KDM hedged her preliminary examination testimony. When asked if she had told her mother after all the incidents occurred or after the first incident, KDM responded, "It was after the second time, I believe." Although the trial testimony and preliminary examination testimony are inconsistent, they are not so divergent to carry much impeachment value. Moreover, whether KDM recalled her age many years after the fact or if she told her mother after the first, second, third, or fourth incident really was of minimal import. There was no dispute that KDM had informed her mother at some time because that presumably is how the family learned of the allegations, which may have led to the questioning of KDM by defendant's sisters.[9]

## D. FAILURE TO INVESTIGATE AND CONSULT AN EXPERT ON CHILD SUGGESTIBILITY

Defendant also argues that trial counsel was ineffective for failing to consult a defense expert on the issue of child suggestibility and forensic protocol. We disagree.

At the evidentiary hearing, defendant presented the testimony of Dr. David Thompson, a clinical forensic psychologist. Dr. Thompson testified that, in general, children are more suggestible than adults. He said that there are many factors that could lead to a child providing unreliable information, such as repeated conversations, external factors, questioning style of the interviewer, interviewer bias, and therapy-treatment techniques. After reviewing certain materials,

---

panties and shorts up and then he will go out of the room and that's when he'll come in and he'll pull my panties down and whatever I had on.

Defendant also cites HW's testimony that defendant never touched her genital area, which was contrary to what KDM said in the forensic interview. But again, defendant does not explain what defense counsel was to do with this "conflict." HW's statement was already in evidence, and in any event, KDM's statements from the Kids-TALK interview could only be used to impeach *her* trial testimony. KDM never testified at trial that defendant touched HW. Indeed, KDM stated at trial that she never saw any incident with HW. And reminding KDM of her forensic interview statement might have led her to recalling an incident with HW.

[9] We note "may have led" because KDM flatly denied that any such conversation or questioning had taken place. Notably, HW testified that she was confronted by one of defendant's sisters but that no one else was present. Regardless, the sister testified that she was aware that KDM had made some allegations against defendant.

he saw the presence of many factors that could have negatively affected the reliability of what KDM had reported. But importantly, Dr. Thompson agreed that he was unable to ascertain whether these factors actually affected KDM's memory or her testimony. Defendant's position is that defense counsel's failure to consult an expert, such as Dr. Thompson, fell below an objective level of reasonableness. We cannot agree. If this were the case, then every criminal attorney would be *required* to consult a child-suggestibility expert when the credibility of a child witness is at issue. Defendant cites no authority for this position. The reasonableness of counsel's decision whether to consult an expert must instead be examined under the facts of each case.

Defendant's reliance on *Trakhtenberg* is misplaced. In *Trakhtenberg*, which involved the criminal prosecution of CSC against a minor victim, defense counsel performed *no* investigation whatsoever, including not demanding any discovery because she thought that such an investigation would lead to information that was irrelevant to the defense theories. *Trakhtenberg*, 493 Mich at 46-47. The Court held that this was unreasonable, especially in light of the fact that defense counsel had elected to forgo any investigation *before* she decided to pursue a particular defense strategy. *Id*. at 54. But in this case, defense counsel did investigate. He hired an investigator and had KDM's forensic interview, CPS reports, emergency room notes, and police reports. Defense counsel also had HW's forensic interview and related police reports. Counsel further talked to defendant many times and spoke with various family members. Unlike the situation in *Trakhtenberg*, counsel in the present case said he formulated his defense and decided that an expert was not necessary *after* reviewing the available information.

Defendant also points to the following comment in *Trakhtenberg*: "[G]iven the exposure the complainant had to multiple interviews and leading questions, a reasonable attorney would have consulted an expert . . . to testify regarding the propriety of how the complainant made her allegations." *Id*. at 54. But again, that situation is distinguishable from the present case because in *Trakhtenberg*, the mother of the complainant, defendant's ex-wife, had a "hatred of [the] defendant," "made negative comments about [the] defendant in front of the complainant," and had engaged in "leading and suggestive question[ing]" of the complainant. *Id*. at 45-46. Had the defense counsel in *Trakhtenberg* investigated, she would have discovered this information and with that information she should have known to consult an expert about the possibility of the complainant being improperly influenced. In the instant case, there was no evidence that anyone in KDM's immediate family had any negative impression of defendant or said anything negative about him in KDM's presence. In other words, unlike in *Trakhtenberg*, there was no evidence that anyone held any animus toward defendant, let alone of any such person having an opportunity to influence KDM. Further, while there were instances of KDM being questioned by various individuals, there is no evidence that the questioning was unnecessarily leading and suggestive.[10]

---

[10] In 2012, KDM initially disclosed to her mother that defendant had sexually assaulted her. KDM indicated that her mother did not do anything in response to the allegation. It would strain credulity to think that the mother, who apparently thought very little of KDM's allegations, would have somehow imprinted any inaccurate memories of abuse on KDM. Likewise, assuming defendant's sisters had questioned KDM about the incident, they clearly would not have wanted to suggest that such an assault had occurred. KDM's disclosures to her father and his friends are a bit different because they did believe KDM, but there is no evidence to show that the questioning was

-11-

Therefore, counsel's performance in this case is distinguishable from counsel's performance in *Trakhtenberg* and did not fall below an objective level of reasonableness.

Moreover, to the extent that counsel's performance did fall below an objective level of reasonableness, defendant has not demonstrated any prejudice. Dr. Thompson's testimony was much too broad and vague to be of any benefit. He merely stated that it is *possible* for children's memories to be implanted. He could not say that this is what occurred here. Further, he noted that he could not identify any particular interview or discussion that affected KDM's memory. He conceded that multiple interviews are not always harmful and do not always result in false memories. Dr. Thompson also conceded that children with very little risk factors present could have a memory implanted and children with a lot of risk factors present could be telling the truth. All told, the best Dr. Thompson could offer was the vague notion that it was possible that KDM may have had her memory affected as a result of her multiple interviews and questioning. In our view, due to the huge uncertainty in Dr. Thompson's testimony, there is no reasonable probability that the result of the trial would have been different had Dr. Thompson, or a similar expert, testified at trial.

## E.  CONCLUSION

Defendant has failed to overcome the "heavy burden" that trial counsel's performance fell below an objective level of reasonableness, with the exception of counsel's failure to introduce the hospital report, which reflected that KDM had only complained of "touching" incidents with defendant. Although this was an unreasonable omission on counsel's part, particularly because he had indicated in his opening statement that he would utilize it, there is no reasonable probability that the verdict would have been different had the hospital record been offered at trial.

## IV.  LIFETIME ELECTRONIC MONITORING

Defendant argues that his sentence of lifetime electronic monitoring constitutes cruel and unusual punishment.[11] We disagree. Because defendant did not challenge the constitutionality of MCL 750.520b(2)(d) in the trial court, this issue is unpreserved. We review unpreserved constitutional issues for plain error affecting defendant's substantial rights. *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013). "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or

---

influential. KDM stated that her father's friend Tiffany merely asked what had happened. The questioning by KDM's father's (unnamed) girlfriend involved her disclosing to KDM that her daughter had been the victim of sexual abuse. The actual contents of that disclosure are not known. Regardless, it was a solitary incident that occurred several years after KDM's initial disclosures of abuse. As defendant's expert acknowledged at the evidentiary hearing, such an incident could not have implanted memories that had been in existence before the incident.

[11] For his CSC-I conviction, defendant was sentenced to 10 to 25 years' imprisonment and lifetime electronic monitoring. The imposition of lifetime monitoring was required by MCL 750.520b(2)(d), regardless of defendant's age. *People v Comer*, 500 Mich 278, 289; 901 NW2d 553 (2017).

obvious, and that the plain error affected substantial rights." *People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015).

The United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII, and the Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16. Consequently, "[i]f a punishment 'passes muster under the state constitution, then it necessarily passes muster under the federal constitution.' " *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011), quoting *People v Nunez*, 242 Mich App 610, 618-619 n 2; 619 NW2d 550 (2000).

Our Supreme Court has held that lifetime electronic monitoring constitutes "punishment," *People v Cole*, 491 Mich 325, 335-336; 817 NW2d 497 (2012), and therefore is subject to the constitutional limitations against cruel or unusual punishments. As explained in *People v Hallak*, 310 Mich App 555, 571-572; 873 NW2d 811 (2015) (citations and some quotation marks omitted), reversed in part on other grounds 499 Mich 879 (2016):

> In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states. However, the "dominant test" is the proportionality question, which is whether the punishment is so excessive that it is completely unsuitable to the crime.
>
> The goal of rehabilitation is also a consideration. If the punishment thwarts the rehabilitative potential of the individual offender and does not contribute toward society's efforts to deter others from engaging in similar prohibited behavior, it may be deemed excessive. However, the "need to prevent the individual offender from causing further injury to society" is an equally important consideration. In the end, a penalty that is unjustifiably disproportionate to the crime or unusually excessive should be struck down as cruel or unusual.

In *Hallak*, this Court addressed the constitutionality of lifetime electronic monitoring. The Court held that such punishment "does not violate [a] defendant's state or federal rights against cruel and/or unusual punishment." *Id*. at 577. The Court noted that the imposition of lifetime electronic monitoring for those convicted of committing CSC against someone less than 13 years of age "addresses the significant concerns of rehabilitation and recidivism." *Id*. at 573. "To combat these substantial recidivism risks, it has been recognized that 'the monitoring system has a deterrent effect on would-be re-offenders' and 'the ability to constantly monitor an offender's location allows law enforcement to ensure that the offender does not enter a school zone, playground, or similar prohibited locale.' " *Id*. at 574 (citation omitted). The Court explained that any "harshness" in the penalty for committing CSC against a child less than 13 years of age was justified because of "[t]he high recidivism rate and vulnerability of the victims"—children, who are "some of the most vulnerable individuals in our society." *Id*. at 574-575.

However, as defendant points out, the analysis in *Hallak* was limited to defendants who were over the age of 17 when they committed CSC-II.[12] See *id*. at 566-567. Defendant contends that in light of United States Supreme Court precedent, a different result is required for the mandatory imposition of lifetime monitoring for individuals who were under the age of 17 when they committed CSC. Defendant relies on *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), which recognized that children are fundamentally different from adults for purposes of sentencing because juveniles have a diminished culpability and greater prospects for reform. *Id*. at 471. *Miller* consequently held that the imposition of mandatory life imprisonment without the possibility of parole on people who were juveniles at the time they committed their crimes was unconstitutional. *Id*. at 479.

The trial court did not commit any clear or obvious error. *Miller* addressed the imposition of mandatory life imprisonment without the possibility of parole. It was the *severity* of this punishment, coupled with its mandatory nature, that concerned the Court when applied to a person who was a juvenile at the time he committed the crime. See *id*. at 472 (noting that Supreme Court precedent "emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the *harshest sentences* on juvenile offenders, even when they commit terrible crimes") (emphasis added). The Court likened life-without-parole sentences to death sentences because such a sentence "alters the remainder of his life by a forfeiture that is irrevocable." *Id.* at 474-475 (quotation marks and citation omitted); see also *id*. at 475 (viewing the ultimate penalty of life without parole for juveniles as akin to the death penalty); *Graham v Florida*, 560 US 48, 69; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (noting that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences").

In this case, the imposition of lifetime electronic monitoring is mandatory under MCL 750.520b(2)(d), even for juvenile offenders when they commit CSC-I against a child under the age of 13, but the severity of this punishment does not compare to life imprisonment without the possibility of parole. While both are "lifetime" punishments, that is where the similarity ends. Lifetime monitoring does not remotely impair an individual like lifetime imprisonment (or death). A person who has been released from prison and is being electronically monitored is not prohibited "from traveling, working, or otherwise enjoying the ability to legally move about as he wishes." *Hallak*, 310 Mich App at 581. Given the disparate differences between the punishments of lifetime electronic monitoring and lifetime imprisonment without parole, defendant has failed to demonstrate the existence of any plain error, and his unpreserved constitutional claim on appeal fails.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Michael J. Kelly

---

[12] While any defendant who commits CSC-I against a person less than the age of 13 is subject to lifetime monitoring, MCL 750.520b(2)(d), only those who are over the age of 17 and commit CSC-II against a person less than the age of 13 are subject to lifetime monitoring, MCL 750.520c(2)(b).