*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
January 15, 2025
9:58 AM

Plaintiff-Appellee,

v

No. 366138
Marquette Circuit Court
LC No. 2021-060328-FC

SHADRACH JAMES CUNNINGHAM,

Defendant-Appellant.

Before: N. P. HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

A jury found defendant guilty of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f) (sexual penetration accomplished by use of force or coercion, causing personal injury). The trial court sentenced defendant to serve concurrent sentences of 6 to 30 years in prison for each count of CSC-I. Additionally, the trial court sentenced defendant to lifetime electronic monitoring (LEM). Defendant appeals as of right, challenging both his convictions and the LEM portion of his sentence, which is mandatory under MCL 750.520b(2)(d). We affirm.

## I. FACTUAL BACKGROUND

In 2021, the victim and defendant attended the same university and were friends; they both were involved in collegiate sports. In the late evening of January 16, defendant invited the victim to a gathering in a dormitory suite near his own suite. The victim met defendant and other individuals in the dormitory. When she saw defendant, she observed that defendant appeared somewhat intoxicated. After approximately 10 minutes, defendant grabbed the victim's hand and led her down the hallway into his own suite and bedroom.

Defendant closed the bedroom door, put his arm around the victim, and kissed her. The victim testified that she was surprised by the kiss because they had never kissed before. While the victim kissed defendant back briefly, she quickly decided she did not want to kiss him. The victim then pulled away, but defendant grabbed the victim's neck more forcibly to kiss her again. Defendant also pulled the victim across his lap, and the victim believed defendant's intentions were to have sex. She told defendant to stop and that she did not want to have sex, but defendant merely replied that he would not tell anyone. The victim described how she became fearful

-1-

because defendant was not listening to her. Defendant removed the victim's sweatshirt, placed her on her back, and pinned her legs in such a way that prevented her from moving. Defendant "ripped off" the victim's jeans, leggings, shorts, and underwear by pulling them down and over her feet. The victim continued trying to talk to defendant and convince him to stop.

Defendant violently put his fingers inside the victim's vagina, causing the victim to go into shock. Defendant also penetrated the victim's vagina with his penis before grabbing a condom from his desk. While doing so, defendant held the victim down with one of his hands. The victim described herself as being still pinned and unable to move. The victim continuously told defendant to stop, but defendant did not listen. Defendant subsequently flipped the victim onto her knees, which was painful for the victim because she was recovering from knee surgery, and her face was pushed up against a ladder used to access the lofted bed. Defendant again penetrated the victim's vagina. The victim did not believe she could escape defendant because he overpowered her with his size and strength. Defendant eventually stopped and sat down. The victim gathered her clothes and shoes, put them on quickly, and left.

Immediately following the incident, the victim disclosed the incident to her father and stepmother, who then contacted law enforcement. The victim met with a campus police officer at approximately 2:00 a.m., who described the victim's demeanor as fluctuating between very quiet and extremely upset. In addition, the victim contacted one of her friends, and told this friend that defendant "raped her" and that he did not listen when she told him to stop.

The victim went to the hospital because she was experiencing vaginal bleeding. She testified that she had a swollen lip and scratches on her neck and breast. Paperwork from a nurse's examination of the victim revealed swelling "to bottom lip and bite mark"; possible bruising on the neck along with pain to the touch; a mark, possibly bruising or discoloration, on the left side of the chest with pain to the touch; an "abrasion" or "scratch" on an unspecified arm; swelling on "labia minora," which is "tissue . . . surrounding the vagina and urethra"; and an "abrasion near cervix." After the victim left the hospital, she received a message from defendant that read: "Hey, I think we hung out last night. I don't really remember much, but I'm sorry if I was tripping." The victim did not respond to the message. In the aftermath of the incident, the victim experienced psychological symptoms, such as anxiety attacks, and attempted suicide twice.

Defendant testified at trial. He agreed that the sexual encounter occurred, but, according to his version of events, everything that occurred was consensual. He testified that the victim never gave any verbal or physical indication that she did not want to engage in the sexual encounter. Defendant was convicted by a jury and sentenced as earlier described. This appeal followed.

## II. ANALYSIS

## A. JURY INSTRUCTIONS

Defendant raises three challenges to the instructions read to the jury. First, he argues that M Crim JI 20.25 should not have been given. Second, he contends that the jury needed to unanimously agree on the manner in which the victim sustained personal injury. Third, he

maintains that M Crim JI 20.27 was inadequate because it did not include the additional language defendant had requested. Addressing each in turn, we disagree.

"To preserve an instructional error for review, a defendant must object to the instruction before the jury deliberates." *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003). Defendant concedes that he failed to preserve his first and second challenges because he did not object to M Crim JI 20.25 and M Crim JI 20.9 as given. However, defendant preserved his third challenge by requesting that the trial court include additional language for M Crim JI 20.27.

Generally, we review de novo preserved issues involving jury instructions. *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021). Furthermore, "[t]his Court reviews the trial court's determination whether a jury instruction is applicable to the facts of the case for an abuse of discretion." *Id*. (quotation marks and citation omitted). A trial court abuses its discretion when its "decision is outside the range of principled outcomes." *Id*. (quotation marks and citation omitted). However, we review defendant's unpreserved first and second challenges for plain error affecting defendant's substantial rights. *Gonzalez*, 256 Mich App at 225. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To affect substantial rights, the error must be prejudicial, i.e., the error "affected the outcome of the lower court proceedings." *Id*.

A defendant is entitled to have a jury that is correctly instructed. *Montague*, 338 Mich App at 37. The trial court must "instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *Id*. (quotation marks and citation omitted). Such instruction must include the charged offenses' elements as well as "any material issues, defenses, and theories that are supported by the evidence." *Id*. at 37-38 (quotation marks and citation omitted). If the instructions "fairly presented the issues to be tried and sufficiently protected the defendant's rights," there is no error. *Id*. at 38 (quotation marks and citation omitted). "Finally, jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Id*.

### 1. M CRIM JI 20.25

The trial court did not plainly err by instructing the jury that the victim's testimony did not need to be corroborated.

During the jury voir dire, the prosecution informed the prospective jurors: "There's going to be a jury instruction that the victim's testimony does not need to be corroborated, meaning that if you believe through her testimony that I prove this case beyond a reasonable doubt, you don't need anything more than that to convict the [d]efendant." This was a reference to M Crim JI 20.25, which provides: "To prove this charge, it is not necessary that there be evidence other than the testimony of [*name complainant*], if that testimony proves guilt beyond a reasonable doubt." Later, the prosecution asked the prospective jurors if there was any specific evidence that they expected to see. The trial court interjected and stated that it would instruct the jury about the definition of evidence. Additionally, the trial court stated that there was

also a jury instruction that says that the testimony of a victim need not be corroborated. Meaning, you don't have to have other evidence if it still proves the case beyond a reasonable doubt. That part never changes. No matter what the evidence is, there has to be proof beyond a reasonable doubt.

But the issue is sometimes all the evidence you have is testimony of witnesses, so that's kind of the context of the question.

The prosecution asked the prospective jurors if there was "concern about that instruction or concern about having to potentially just rely on the victim's testimony, itself," to which the prospective jurors gave no such indication. After the close of proofs, the trial court gave M Crim JI 20.25.

M Crim JI 20.25 is a result of MCL 750.520h, which provides that "[t]he testimony of a victim need not be corroborated in prosecutions under sections 520b to 520g." This "anti-corroboration rule," *People v Norwood*, 70 Mich App 53, 57; 245 NW2d 170 (1976),[1] is a longstanding rule in Michigan, see *People v Inman*, 315 Mich 456, 471-472; 24 NW2d 176 (1946) (stating that the victim's uncorroborated testimony is sufficient to sustain a conviction). Its purpose "is not to save verdicts in which inadmissible corroborating evidence is introduced" but, instead, "to permit a verdict to withstand a challenge to the sufficiency of the evidence in a case in which the only testimony against the defendant is that of the complainant." *Norwood*, 70 Mich App at 57. Defendant takes issue not with the statute itself but, rather, with informing the jury about it. In other words, defendant does not argue that a victim's testimony must be corroborated to sustain a conviction; rather, defendant argues that, by discussing it during voir dire and instructing the jury about it, the victim's testimony was improperly singled out as being "special."

In *People v Smith*, 149 Mich App 189, 195; 385 NW2d 654 (1986), this Court held that "[t]he trial court did not err in reading as part of its instructions CJI 20:1:01,[2] which accurately states the law as provided in MCL 750.520h; MSA 28.788(8)." *Smith* involved convictions of CSC-I and other various offenses. *Id*. at 191. In holding that the trial court did not err by reading the instruction to the jury, this Court not only relied on the instruction accurately encompassing MCL 750.520h but also on the fact that "the instruction was applicable in this case since defense counsel vigorously argued in closing that, because of the strength of the alibi defense, the jury should insist on some corroborative evidence, which the prosecution had failed to supply." *Id*. at 195.

---

[1] Published decisions of the Court of Appeals issued on or after November 1, 1990, are precedentially binding. MCR 7.215(J)(1). Although this Court is "not strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, . . . they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

[2] CJI 20:1:01 was the precursor to M Crim JI 20.25.

In this case, the trial court gave an instruction that accurately encompassed MCL 750.520h, and the instruction was particularly applicable since defense counsel during closing remarks explicitly highlighted the lack of corroborating evidence. We find *Smith* to be analogous and persuasive. Furthermore, the trial court is required to "instruct the jury as to the law applicable to the case and in his charge make such comment on the evidence, the testimony and character of any witnesses, as in his opinion the interest of justice may require." MCL 768.29. By alerting the jury to MCL 750.520h, the trial court followed this requirement. Defendant cites cases from other jurisdictions that do not permit an anticorroboration instruction to be read to the jury, but such cases are not binding on this Court. *Lewis v Farmers Ins Exch*, 315 Mich App 202, 214; 888 NW2d 916 (2016).

Defendant argues that highlighting M Crim JI 20.25 during voir dire constituted improper bolstering of the victim's testimony. Although it is impermissible to vouch for the credibility of a witness, see *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004); *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007), this did not occur in this case. Neither the prosecution nor the trial court commented on whether the victim's testimony was credible; rather, they merely highlighted the state of Michigan law, i.e., that corroborating evidence is not needed so long as the victim's testimony proved the elements beyond a reasonable doubt. In fact, the trial court twice emphasized that the jury must find the elements proven beyond a reasonable doubt, which highlighted to the jury that the victim's testimony must nonetheless prove the elements of the offenses.

Defendant also takes issue with the trial court's use of the word "victim," during voir dire when the trial court stated that there was a "jury instruction that says that the testimony of a victim need not be corroborated." Defendant asserts that such a reference deprived him of his presumption of innocence, but he provides no authority to establish that the trial court's statement was improper. MCL 750.520a(s) explicitly defines "[v]ictim" to be "the person alleging to have been subjected to criminal sexual conduct." (Quotation marks omitted.) Accordingly, the trial court may refer to the person alleging criminal sexual conduct as the "victim."

Defendant relies upon *People v Stanaway*, 446 Mich 643, 677 n 37; 521 NW2d 557 (1994), for the principle that "the legal status of an accuser as victim does not obtain until a conviction is entered." However, that statement addressed circumstances unrelated to a trial in a criminal sexual conduct case. Instead, the issue involved the discoverability of a statutorily privileged health record in a criminal trial. *Id.* Moreover, this statement was made in a footnote in the majority opinion, to address a suggestion raised by a concurring justice, and had no bearing on the Supreme Court's ruling. Consequently, the statement was nonbinding obiter dicta. *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011). Defendant has failed to show error that was clear or obvious. See *Carines*, 460 Mich at 763.

Even if the trial court's statement amounted to error, defendant cannot show that it was outcome-determinative error. See *id.* In the trial court's singular use of the term, the trial court did not refer to the specific victim in this case; rather, the trial court referred to the instruction and to a hypothetical victim in general terms. Later, when instructing the jury, the trial court used the victim's name. Defendant has not demonstrated that a single reference to a hypothetical victim was the basis for the jury's verdict, rather than the evidence presented.

## 2. M CRIM JI 20.9

The trial court did not plainly err by failing to give an unanimity instruction regarding the manner in which personal injury could occur.

During the prosecution's closing remarks, the prosecution without objection made the following remarks about the personal injury element for MCL 750.520b(1)(f):

> What we're focused on here is either bodily injury or mental anguish. *You all do not have to agree on a specific theory of personal injury*. Some people may think that [the victim] suffered mental anguish as a result of this assault. Others may think that she did not, but suffered bodily injury as a result of this sexual assault. Think of the marks on her neck. A mark on her neck that appeared to be developing into a bruise. The bit [sic] mark on her lip. The swelling in her vagina. The abrasion that was near her cervix. *And it's okay if not everybody is in agreement with what form of personal injury that [she] suffered*, as long as you all believe that some form of personal injury, whether it's bodily injury or mental anguish occurred. [Emphasis added.]

The trial court gave M Crim JI 20.9, which defines the element of personal injury. M Crim JI 20.9(2) provides: "Personal injury means bodily injury, disfigurement, chronic pain, pregnancy, disease, loss or impairment of a sexual or reproductive organ, or mental anguish. Mental anguish means extreme pain, extreme distress, or extreme suffering, either at the time of the event or later as a result of it." M Crim JI 20.9(3) contains a list of considerations in determining whether there was mental anguish. The trial court gave the jury a general unanimity instruction, but, when giving M Crim JI 20.9, it did not give a specific unanimity instruction for the manner in which the personal injury element could occur.

MCL 750.520b(1)(f) requires the following elements: the offender sexually penetrated the victim, the offender used force or coercion to sexually penetrate the victim, and the offender caused personal injury to the victim. The statute defines force or coercion in a nonexhaustive list. See MCL 750.520b(f)(*i*) to (*v*). As noted, the trial court gave M Crim JI 20.9, which defined personal injury and gave various examples of how personal injury could occur. Defendant argues that this general instruction was insufficient because the jury needed to unanimously agree on the way in which personal injury occurred.

However, in *People v Asevedo*, 217 Mich App 393, 397; 551 NW2d 478 (1996), this Court explicitly held that a jury was not required to unanimously agree on how a victim sustained personal injury for purposes of CSC-I. This Court reasoned

> that bodily injury and mental anguish are not alternative theories upon which a jury is required to make independent findings, as proposed by defendant. When a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory. The same reasoning applies here. Because bodily injury, mental anguish, and the other conditions listed in MCL 750.520a(j); MSA 28.788(1)(j) *are merely different ways of defining the single element of personal*

-6-

*injury, we believe they should not be construed to represent alternative theories upon which jury unanimity is required.* Accordingly, if the evidence of any one of the listed definitions is sufficient, then the element of personal injury has been proven. [*Id*. at 397 (emphasis added).]

Defendant requests this Court to revisit this issue, but, as a case decided after November 1, 1990, *Asevedo* is binding on this Court. See MCR 7.215(J)(1). Furthermore, we discern no error in its reasoning.

### 3. M CRIM JI 20.27

The trial court did not err by refusing to add defendant's requested language regarding the prosecution's burden to prove the absence of consent.

During the trial court and parties' discussion of the jury instructions, defendant took issue with M Crim JI 20.27, which addresses consent. More specifically, M Crim JI 20.27(4) provides: "If you find that the evidence raises a reasonable doubt as to whether [*name complainant*] consented to the act freely and willingly, then you must find the defendant not guilty." Defense counsel did not object to the inclusion of this paragraph but, instead, requested the following language be added to the beginning of this paragraph: "The Prosecutor bears the burden of proving the absence of consent beyond a reasonable doubt." The trial court noted that this was "crafted from some caselaw on this issue about affirmative defenses, which consent is." The prosecution opposed this language, and the trial court agreed. The trial court reasoned that the prosecution's

burden of proof is proving force or coercion, which, since that's the absence of consent, I don't really think it's necessary to give further burden of proof on this issue. I think the Prosecutor always has the burden of proof on force or coercion, and the Instruction says that consent can only exist without that.

Moreover, the trial court reasoned that "[m]y general sense is that additional detail and affirmative defenses and burden, it short of adds confusion rather than keeping the straightforward concept in the Jury Instruction that consent can only exist in the absence of force or coercion."

On appeal, defendant contends that, because consent was an affirmative defense, the trial court erred by not adding language to M CRIM JI 20.27 specifying that the prosecution had the burden of proving the absence of consent beyond reasonable doubt. Defendant points to *People v Thompson*, 117 Mich App 522, 525-526; 324 NW2d 22 (1982), in which this Court held that the failure "to instruct the jury on the defense of consent to" CSC-I constituted error requiring reversal. Additionally, this Court took issue with the trial court's instruction on consent for the charge of kidnapping, holding that the instruction was erroneous because it improperly shifted the burden to the defendant on consent, which was an affirmative defense. *Id*. at 528-529. Accordingly, this Court instructed that, on remand, if the evidence "warrants instructions on consent as a defense to kidnapping or criminal sexual conduct," the trial court must properly instruct the jury about the burden being on the prosecution. *Id*. at 529. Similarly, in *People v Hearn*, 100 Mich App 749, 755; 300 NW2d 396 (1980), this Court held that the trial court should have instructed the jury about consent, which was the theory of defendant's defense. Although the defendant testified that the victim consented to the sexual relations, "[t]he trial court . . . failed to instruct on consent." *Id*.

at 752. This Court reversed, holding that "[d]efendant's theory of defense should have been presented to the jury in the instructions." *Id*. at 755.

This case is distinguishable from both *Thompson* and *Hearn* because the trial court did instruct the jury about consent. The court explicitly instructed the jury that, if it determined there was consent, it must acquit defendant. Moreover, the instruction did not improperly shift the burden to defendant to prove consent; rather, it informed the jury that, if the evidence raised a reasonable doubt about consent, it must acquit defendant. This was a reference to the prosecutor's burden, not defendant's burden. Although defendant's requested language may have informed the jury about the prosecutor's burden in a different way, the instructions given to the jury fairly presented the issues and sufficiently protected defendant's rights, see *Montague*, 338 Mich App at 38, because there was no danger of the jury placing the burden on defendant to prove consent.

## B. GREAT WEIGHT OF THE EVIDENCE

Next, defendant argues that his convictions were against the great weight of the evidence. More specifically, defendant contends that it was unbelievable and defied physical reality for him to remove the victim's jeans, leggings, shorts, and underwear in one motion. Similarly, defendant argues that it was unbelievable and defied physical reality for him to hold the victim down with one hand while using the other to remove his pants, grab a condom from a drawer, remove it from its package, and place the condom on his penis. We disagree.

A defendant must move for a new trial to preserve the assertion that the jury's verdict was against the great weight of the evidence. *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014). Defendant failed to do so, leaving this issue unpreserved. "Unpreserved challenges to the great weight of the evidence are reviewed for plain error affecting the defendant's substantial rights." *Id*.

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (quotation marks and citation omitted). This Court explained that

> [c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. [U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination. [*Id*. (citation omitted; alterations in original).]

Nonetheless, "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses." *Id*. (quotation marks and citation omitted; alteration in original).

In this case, the victim agreed that defendant removed the victim's jeans, leggings, sport shorts, and underwear in "one fluid motion." Prior to the removal, defendant started to unbutton the victim's jeans. The victim explained that defendant "dug his fingers into . . . my pants and my shorts" "[a]nd ripped off the bottom half of what I was wearing." Defendant was an athlete, and

-8-

the victim described how her body was much smaller than defendant's and how she felt overpowered. It was not unbelievable or against physical realities for defendant, a larger athlete, to aggressively use his fingers to remove layers of clothing all at once after loosening the victim's jeans.

Additionally, the victim explained how defendant "first put [his penis] inside of my vagina and I was still laying on my back at this point, he had one hand kind of like on my lower abdomen . . . keeping me there, and he reached back and grabbed a condom from his desk." The victim explained that she "could touch [the desk] from sitting on the end of the futon," and the victim agreed that defendant did not "have to get up to reach the desk at all." Defendant presented a photograph of his bedroom, which allowed the jurors to assess for themselves whether defendant could have reached the desk from the futon. Moreover, our review of the exhibit suggests that the desk was a couple feet away from the futon, a distance reasonably within someone's reach. The victim testified that she went into shock and effectively resigned herself to the situation in the hopes of it ending soon. It was not unbelievable or against physical realities for defendant to obtain and utilize the condom from a desk within reaching distance while keeping the shocked victim pinned with his body and the other hand. Although the victim may have given different statements at a prior Title IX hearing, defense counsel used this to impeach the victim, and it was within the province of the jury to determine credibility.[3] Defendant's conviction is not against the great weight of the evidence.

## C. CRUEL OR UNUSUAL PUNISHMENT

Next, defendant argues that mandatory LEM constitutes cruel or unusual punishment as applied to him. We disagree.

At sentencing, defendant challenged mandatory LEM as being cruel or unusual punishment under both the United States and Michigan Constitutions. Defendant conceded that the monitoring was mandatory pursuant to MCL 750.520b(2)(d), but the objection was raised for the record. Defendant contended that LEM was cruel or unusual because he and the victim were adults, defendant had no criminal history, and there was no indication of recidivism. Although defendant recognized that this Court previously held that LEM was not cruel or unusual punishment for second-degree criminal sexual conduct (CSC-II), defendant argued that the prior case was

---

[3] We note that in the argument section of defendant's appellate brief, he asserts, without elaboration, that trial counsel was ineffective for failing to move for a directed verdict. This assertion was not included in the statement of questions presented, which generally waives appellate consideration. *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 337 n 3; 802 NW2d 353 (2010). Moreover, defendant fails to provide any analysis concerning counsel's performance. "As we have repeatedly stated, an appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013) (quotation marks and citation omitted). See also *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009) ("Failure to brief an issue on appeal constitutes abandonment.").

distinguishable. The trial court ruled that LEM was mandatory, and it imposed this along with a sentence of 6 to 30 years in prison for each CSC-I count.

This Court reviews de novo constitutional issues, *People v Pennington*, 240 Mich App 188, 191; 610 NW2d 608 (2000), and the interpretation and application of a statute, *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017). The United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII, whereas the Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16. Because the language within the Michigan Constitution is broader and provides greater protection than the United States Constitution, a statute upheld under the state constitution "necessarily passes muster under the federal constitution." *People v Hallak*, 310 Mich App 555, 569; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016) (quotation marks and citation omitted).

For CSC-I offenses, MCL 750.520b(2)(d) provides: "In addition to any other penalty imposed under subdivision (a) or (b), the court *shall sentence* the defendant to [LEM] under section 520n [i.e., MCL 750.520n]." (Emphasis added). Our Supreme Court previously held that "the Legislature has *mandated* [LEM] for *all* CSC-I sentences except when the defendant is sentenced to life without the possibility of parole under § 520b(2)(c)." *Comer*, 500 Mich at 289 (emphasis added). Therefore, there is no discretion for a sentencing judge on whether to impose this sentence.

"A party challenging the constitutionality of a statute has the burden of proving its invalidity." *People v Jarrell*, 344 Mich App 464, 482; 1 NW3d 359 (2022). Challenges may be either "facial" or "as applied." *Id*. "A facial challenge involves a claim that there is no set of circumstances under which the enactment is constitutionally valid, while an as-applied challenge considers the specific application of a facially valid law to individual facts." *Id*. (quotation marks and citations omitted). Defendant argues that, as applied to him, mandatory LEM for CSC-I constitutes cruel or unusual punishment.

As a threshold matter, there must first be a punishment in order for the cruel or unusual prohibition to apply. *Id*. at 483. This Court previously held that LEM constitutes a punishment. *Hallak*, 310 Mich App at 571. Therefore, this threshold matter has been met. Moving to the next part of the analysis, this Court recently explained:

> To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. [*Jarrell*, 344 Mich App at 484 (quotation marks and citation omitted).]

This Court previously held that LEM for a CSC-II conviction was not cruel or unusual punishment under the Michigan Constitution, *Hallak*, 310 Mich App at 573-574, and it rejected the defendant's facial and as-applied challenge, *id*. at 576-577. In doing so, this Court described how LEM allows law enforcement to ensure that an offender is not in a prohibited location, and how LEM acts as a deterrent. *Id*. at 574.

Adopting applicable analysis from *Hallack*, we similarly conclude that defendant's as-applied challenge is without merit. First, regarding the first factor, LEM is not a disproportionately harsh penalty compared to the gravity of defendant's CSC-I offense. Defendant was convicted of CSC-I involving personal injury and the use of force or coercion, MCL 750.520b(1)(f), which meant he had to not only use force or coercion to sexually penetrate the victim but also had to cause personal injury to the victim. The record evidence shows that defendant forcibly and violently sexually penetrated the victim both digitally and with his penis despite continued requests to stop. Defendant used his size, strength, and friendship to surprise, overpower, and prevent the victim from leaving. The seriousness of the offense is further supported by the effects on the victim, both physically and mentally. The victim sustained physical injuries and long-lasting mental health effects, including two suicide attempts.

Although defendant is subject to mandatory LEM, after his release from prison, LEM does not prohibit defendant from traveling, working, or moving about legally as he wishes. See *id*. at 581. Additionally, "[t]here are few crimes considered as grave in our society as CSC-I," *Jarrell*, 344 Mich App at 485, which is reflected by the Legislature's decision to make CSC-I punishable "by imprisonment for life or for any term of years," MCL 750.520b(2)(a). The nature of CSC offenses has been explicitly designated by our Legislature to be extremely grave offenses that pose a more unique danger to communities:

> The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. [MCL 28.721a.]

The Legislature has also distinguished between CSC-I offenses like those in the present case versus those that involve an offender 17 years of age or older and victim under 13 years of age. For the latter situations, the offender is subject to a mandatory minimum of 25 years in prison. See MCL 750.520b(2)(b). This difference was reflected in defendant's sentence, which involved only a six-year minimum sentence.

For the second factor, for largely the same reasons espoused in *Hallak*, we believe mandatory LEM is not unduly harsh when compared to other penalties imposed for other offenses in Michigan. Mandatory LEM is not only required for CSC-I, which is the gravest of the CSC offenses, but also for CSC-II, MCL 750.520c(2)(b), which is a less grave offense. Although mandatory LEM is not imposed for other serious crimes like murder or robbery, this "ignores the ancillary societal benefit of this lifelong monitoring: to ensure that certain sex offenders will not again be in a position to exploit their potential victims . . . ." *Hallack*, 310 Mich App at 574-575. While this Court made such remarks in the context of child victims, we discern no reason not to apply the same logic to adult victims under the circumstances of this case. See also MCL 28.721a.

For the third factor, we rely on *Hallak*'s determination that LEM for sex offenders is not unique to Michigan. As this Court stated, "[A]t least 11 (including Michigan) have mandated lifetime monitoring for defendants convicted of the most serious CSC offenses or CSC with a

-11-

minor." *Hallack*, 310 Mich App at 575. Finally, for the fourth factor, we believe that, similar to *Hallak*, LEM does assist in defendant's rehabilitation. Sex offenders pose a unique danger to society, and their risk of reoffending is particularly high. See *id.* at 573; *Smith v Doe*, 538 US 84, 103; 123 S Ct 1140; 155 L Ed 2d 164 (2003). The Legislature has statutorily recognized the particular danger posed by sex offenders, see MCL 28.721a, and LEM serves the purpose both of deterring such offenders from reoffending and also preventing them from entering prohibited zones, *Hallak*, 310 Mich App at 574.

Therefore, none of the four factors weigh in defendant's favor, and we hold that the punishment of mandatory LEM is not grossly disproportionate to the gravity of the CSC-I offenses committed by defendant. Defendant largely ignores this four-factor test and, instead, focuses on his age and how his youthful attributes were not considered in sentencing. Defendant was 18 years old at the time of the offenses and did not have a criminal record. He relies on *People v Parks*, 510 Mich 225, 247-254; 987 NW2d 161 (2022), in which the Court questioned the societal line drawn between those age 17 and those age 18, relying in part on various scientific studies that demonstrated the juvenile aspects of an 18-year-old's brain. The *Parks* Court held that imposing mandatory life without parole for 18-year-old defendants who are convicted of first-degree murder constituted cruel or unusual punishment under the Michigan Constitution. *Id.* at 265-266. However, in reaching this conclusion, it determined that all four factors weighed in the defendant's favor, which stands in contrast to the present case. Moreover, mandatory life in prison without parole is a far more serious punishment than mandatory LEM, which shaped the Court's analysis of the four factors. Finally, *Parks* did not involve the unique dangers posed by CSC offenders. Such differences persuade us that, although the trial court was precluded from considering defendant's attributes of youth and lack of criminal record, this on its own does not overcome the presumption of validity to the statutory sentence.

## D. CUMULATIVE ERROR

Finally, defendant argues that the cumulative effects of the errors deprived him of a fair trial. We disagree.

This Court "review[s] this issue to determine if the combination of alleged errors denied defendant a fair trial." *Dobek*, 274 Mich App at 106. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Id.* Without any errors, there can be no basis for a new trial. See *id.* None of defendant's challenges to his convictions hold merit: the trial court did not err or plainly err in any of the challenged instructions, and the verdict was not against the great weight of the evidence. Defendant has failed to show that the reliability of the verdict was undermined. Therefore, defendant was not denied a fair trial and is not entitled to relief.

Affirmed.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado