*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER DAVID VANOVER,

        Defendant-Appellant.

UNPUBLISHED
April 15, 2026
11:31 AM

No. 368480
Genesee Circuit Court
LC No. 2021-048326-FC

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b), third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(a), and accosting a child for an immoral purpose, MCL 750.145a. The Genesee Circuit Court sentenced him to 135 months' to 50 years' imprisonment for the CSC-I count, 43 months' to 15 years' imprisonment for two of the CSC-II counts, 14 months' to 5 years' imprisonment for the third count of CSC-II, 60 months' to 15 years' imprisonment for the CSC-III count, and 10 months' to 4 years' imprisonment for accosting a child, with credit for 101 days served in jail. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises from allegations that defendant sexually assaulted several of his cousins. Defendant was only charged in connection with alleged events occurring when he was over 17 years old. At the beginning of the first day of trial, defendant stipulated to allow testimony about earlier sexual acts "in order to impeach the credibility of some of the witnesses." Defendant confirmed that he had talked with his counsel for "several hours" about the decision whether to object to such evidence, that he was "fully advised of that choice and the great risk that it poses to [his] case," and that he understood that the evidence "could end up giving a pretty bad impression to the jurors."

DT1, defendant's cousin and the oldest of the victims, testified that he had "hazy" memories of being inappropriately touched by defendant when he was as young as four to six years of age, but the earliest concrete memory was when he was eight or nine years old. He recalled that

-1-

when he was visiting defendant's house, defendant and defendant's older brother were "playing with each other's penises," and they got DT1 and his younger brother, DT2, to "go along with it" and join in touching each other's penises. DT1 recalled that defendant tried to get DT1 and DT2 to touch his penis again when he was about nine or ten years old. After that point, defendant began sexually touching DT1 and DT2 "every time he had a chance," including making them perform oral sex on him. At about nine or ten years old, DT1 woke up in bed to find defendant performing oral sex on him. At about 12 or 13 years old, DT1 passed by a bedroom in defendant's house and saw defendant performing oral sex on defendant's one-year-old brother. At about 13 years old, he saw defendant masturbating in front of DT2, and defendant told him that he was "about to masturbate in this cup and make [DT2] drink the semen." The last incident occurred when DT1 was 14, when defendant made him perform oral sex on him in the kitchen of defendant's house. That was the only incident involving DT1 in which defendant was over 17 years old, so he was only charged with committing one count of CSC-III against DT1.

DT2 also testified that the sexual acts began when he was "real young." He reiterated that defendant touched him and DT1 at "any opportunity that he would get that there would be no adult figure in the house besides him." He stated that he was about 9 or 10 years old when DT1 intervened to prevent defendant from making him drink semen from a cup. DT2 specifically recalled one incident in which defendant was tasked with driving DT2 and DT1 home after a Christmas dinner party, but instead defendant pulled into a public parking lot and began "the natural routine" of telling them to perform sexual acts. According to DT2, defendant's sexual acts against him and DT1 continued regularly until their family stopped visiting defendant's house after his grandmother died. Several years later, defendant asked DT2 during a fishing trip if he wanted to "fool around," and DT2 told defendant that he was not doing that anymore. Against DT2, defendant was charged with one count of CSC-II and one count of accosting a child for immoral purposes.

JW, defendant's cousin from a different side of the family, testified about two incidents in which defendant committed a sexual act against her, both of which occurred after defendant turned 17. In connection with those incidents, defendant was charged with one count of CSC-I. IT, another cousin who was born after defendant turned 17, testified about three incidents of defendant's sexual acts or solicitation toward him. In connection with those allegations, defendant was charged with two counts of CSC-II and one count of solicitation to commit the crime of CSC-II. IT also recalled witnessing defendant commit a sexual act against defendant's older brother, BV. In response to that testimony, the prosecutor added another charge of CSC-IV.

On the fifth day of trial, defense counsel requested a special jury instruction "that the prosecutor must prove beyond a reasonable doubt that the defendant was 17 years of age or older at the time of the crime." Defense counsel explained that defendant's decision to stipulate to the admission of testimony about alleged sexual acts before he turned 17 was premised on testimony from the preliminary examination that all his charges were exclusively based on events occurring after he turned 17. The trial court expressed concern about defendant's due process rights, but it did not want to impose a new burden of proof on the prosecutor. The next day, the parties instead stipulated to the following instruction: "For each of the charges that I'm about to read to you, you may only find the defendant guilty of acts that occurred between [defendant's 17th birthday] and January 2011."

The jury found defendant guilty on all counts except CSC-II against DT2 and CSC-IV against BV. In anticipation of sentencing, defendant completed a psychosexual evaluation with a third party, which examined his accountability, empathy toward the victims, and concern toward other people in his life. The evaluation concluded that defendant was at a "below average" risk for recidivism. The trial court sentenced defendant at the top of his sentencing guidelines for the CSC-I conviction and in the middle of his guidelines for the other convictions. Because of the CSC-I conviction, he was also classified as a Tier III sex offender and subjected to lifetime registration under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., and lifetime electronic monitoring (LEM) under MCL 750.520n.

While this appeal was pending, defendant moved for a new trial or evidentiary hearing in the trial court, arguing that defendant was denied the effective assistance of counsel when his trial counsel stipulated to admit evidence of defendant's sexual contact with the victims before he turned 17 years old and failed to object to certain hearsay testimony. During the hearing on the motion, the trial court noted that it did not have the opportunity during the trial to determine whether the other-acts evidence would have been admissible under MRE 403 because defense counsel stipulated to its admission. But the judge stated, "I have engaged in the balancing [test under MRE 403] in my own mind, and I will tell you I would have allowed it in . . . ." The trial court found that defense counsel's decisions were likely the result of his strategy to challenge the timeline of events and highlight inconsistencies in the victims' testimony, and it did not believe that the cumulative hearsay testimony or the other-acts evidence changed the outcome of the case. It denied defendant's motion.

## II. INEFFECTIVE ASSISTANCE

Defendant argues that he was denied the effective assistance of counsel because his defense counsel failed to object to the admission of hearsay and other-acts evidence. We disagree.

### A. STANDARD OF REVIEW

"Whether a defendant received ineffective assistance of trial counsel is a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). A trial's court's factual findings are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*. "A trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo; it is necessarily an abuse of discretion to admit legally inadmissible evidence." *Albro v Drayer*, 303 Mich App 758, 760; 846 NW2d 70 (2014).

### B. OTHER-ACTS EVIDENCE

According to defendant, he was denied the effective assistance of counsel in part because defense counsel stipulated to the admission of testimony about alleged sexual offenses against the victims that defendant allegedly committed when he was under 17 years old. We disagree.

The Michigan and United States constitutions guarantee criminal defendants the right to the effective assistance of counsel. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). See also US Const, Am VI; Const 1963, art 1, § 20. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise." *People v Putman*, 309 Mich App

240, 248; 870 NW2d 593 (2015). "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). The court must consider the totality of the circumstances from counsel's perspective, affording a strong presumption that counsel's decisions "might be considered sound trial strategy." *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted). In other words, the court must not only "give [the] attorneys the benefit of the doubt" but also "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Cullen v Pinholster*, 563 US 170, 196; 131 S Ct 1288; 179 L Ed 2d 557 (2011) (quotation marks and citation omitted).

In this case, defense counsel stipulated to admit any testimony about allegations that defendant committed sexual offenses against the victims before he turned 17 years old. This other-acts evidence mostly related to the earliest alleged sexual offenses against DT1 and DT2. Although defendant was not charged in connection with those allegations, the prosecutor disclosed that she intended to offer the testimony under MCL 768.27a, which reads, in pertinent part, as follows:

> [I]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant. If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence to the defendant at least 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown . . . . [MCL 768.27a(1).]

This statute creates an exception to the general rule that other-acts evidence may only be used "for noncharacter purposes, such as to show a defendant's motive, intent, or common plan or scheme." *People v Watkins*, 491 Mich 450, 471; 818 NW2d 296 (2012). See also MRE 404(b). But evidence that is admissible under MCL 768.27a may still be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403.

"By agreeing to the admission of evidence, a party waives a claim of error regarding the admission of the stipulated evidence on appeal." *In re Guardianship of Gordon*, 337 Mich App 316, 320 n 4; 975 NW2d 114 (2021). Generally, a trial court gives effect to the counsel's agreement about whether to admit certain evidence, even if doing so would waive his client's right to object to that evidence. See *People v Carter*, 462 Mich 206, 218; 612 NW2d 144 (2000). Therefore, because defendant's counsel stipulated to admit the testimony about defendant's earlier alleged sexual offenses, the trial court did not have to address whether the testimony should have been excluded under MRE 403. "Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." *Id*. (quotation marks and citation omitted).

We conclude that defendant has not demonstrated that his counsel was ineffective in making that stipulation. Defense counsel made an extremely clear record of the reason for his

decision to stipulate to that evidence. He informed defendant that he could use inconsistencies in the witnesses' stories about the earlier alleged offenses between the trial and their previous testimony and statements to police officers to impeach their credibility, but that the strategy came with the risk of leaving the jurors with a bad impression of defendant. Given the choice between objecting to the evidence and stipulating to its admission, defendant himself chose to stipulate. "If a properly-informed defendant rejects a potentially beneficial strategy against counsel's advice, we can see no sound reason for granting him relief for trial counsel's failure to override his priorities, even if, in her professional judgment, the defendant is acting contrary to his or her own best interests." *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 362854); slip op at 12. Regardless of whether objecting to the admission of the other-acts evidence would have resulted in a more favorable outcome for defendant, we cannot conclude that defense counsel's performance was objectively unreasonable when he advised defendant about his options for "several hours" and ultimately pursued the trial strategy that defendant requested. Accordingly, defense counsel was not ineffective for stipulating to admit testimony about the sexual offenses against minors that defendant allegedly committed before he turned 17 years old.

## C. HEARSAY

Defendant also argues that defense counsel was ineffective because he failed to object to the trial testimony of several police officers, who repeated statements that DT1, DT2, JW, and IT made to them during their investigation of this case. We disagree.

Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." MRE 801(c)(2). Hearsay is inadmissible unless the rules of evidence provide an exception. MRE 802. "[T]he admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when corroborated by other evidence." *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010). The error is more harmful in trials that involve "a one-on-one credibility contest between the victim and the defendant," but "the hearsay testimony is of less importance and less prejudicial" if the declarant also testifies and is subject to cross-examination. *Id*. at 620-621.

In some circumstances, counsel may have a strategic reason not to object to hearsay, even if the trial court would sustain that objection. *People v Shaw,* 315 Mich App 668, 675; 892 NW2d 15 (2016). For example, in *Shaw*, the defendant argued that his defense counsel was ineffective in part because he failed to object to several hearsay statements during the defendant's trial for ten counts of CSC-I. *Id*. at 671, 673. This Court held that allowing the hearsay to identify inconsistencies between the victim's out-of-court and in-court statements was not an acceptable trial strategy in that particular case, but only because the inconsistencies were "very minor." *Id*. at 676 n 3. It was the "absence of significant inconsistencies" that rendered the strategy an unreasonable one. *Id*. at 676.

In this case, two investigating officers, Lieutenant Melissa Galloway and Sergeant Michael Bernard, testified about their contact with DT1, DT2, and JW. Lieutenant Galloway testified that DT1 told her about "[a]llegations of criminal sexual conduct by [defendant]," and that DT1 said "that he had heard about what happened to [IT], and that he knew it was true because it had happened to him too." She also testified that JW "accounted for two times that [defendant] had penetrated her digitally." Sergeant Bernard testified that DT2 "described the allegations of

[defendant] inappropriately touching him and his brother . . . on their penises," and that DT2 "only approximated age ranges and indicated it happened multiple times." He said that DT1 "added his accounts of being touched by [defendant]" and repeated DT1's statements describing the semen-cup incident.

Defendant argues that defense counsel should have raised a hearsay objection to this testimony. The prosecutor suggests that some statements may not be hearsay because they were only offered to establish how the officers conducted their investigation, not to prove the truth of the matter asserted. But the prosecutor did not clarify that nonhearsay purpose at trial, and the jury never received a limiting instruction on the matter. Even if proving the truth of the matter asserted was not the prosecutor's primary purpose in admitting the statements, the jury potentially could have considered them for that purpose. We also find no applicable exception to the general rule against hearsay, so an objection on that basis may have had merit.

But even if the testimony was objectionable hearsay, defense counsel's decision not to object was not objectively unreasonable. The hearsay that defense counsel allegedly overlooked was possibly beneficial to the defense, or at least it was much less damaging than was the hearsay in *Shaw*. In *Shaw*, the hearsay was extensive and highly detailed, and the investigating officer even testified about her own assessment of the declarant's credibility. *Id*. at 676. But Lieutenant Galloway and Sergeant Bernard only provided basic summaries of the victims' statements, and they made no comments about whether they believed those statements. Only DT1's statements about the semen-cup incident were repeated in any detail, but they differed from the victims' in-court testimony on one significant point. During DT2's cross-examination, he specifically clarified that the semen-cup incident happened in the family room on the main floor of defendant's house, *not* the basement as his earlier testimony seemed to imply. When Sergeant Bernard testified, he indicated that DT1 had said that the semen-cup incident happened "in the basement, maybe also called the pool room." Defense counsel reasonably might have chosen not to object to that testimony because the inconsistency strengthened his previous cross-examination. Similarly, DT1's statement about hearing IT's allegations aligned with counsel's previous cross-examination strategy of probing into whether IT had a vendetta against defendant and whether the victims discussed their respective allegations and influenced each other's statements. And the testimony that DT2 only approximated the dates of the offenses was beneficial to the defense because it emphasized the uncertainty of whether defendant was over 17 years old at the time of each alleged offense. It was not objectively unreasonable to allow this hearsay to slip into the record for the jury's consideration.

In any event, failing to object to the hearsay did not prejudice defendant's case. The outcome of this case depended largely on the credibility of the victims' testimony, which ordinarily would exacerbate the harmful effects of hearsay presented as cumulative testimony. See *Gursky*, 486 Mich at 620-621. But because the declarants had already testified about the matter asserted in those statements and were subject to cross-examination, the prejudicial effect was minimal. See *id*. Lieutenant Galloway and Sergeant Bernard summarized the out-of-court statements in such general terms that the hearsay could not have significantly bolstered the victims' credibility. Out of the testimony that defendant challenges, Sergeant Bernard's summary of the semen-cup incident was the only hearsay that reiterated a victim's out-of-court statements in any detail. But the prejudicial effect of that testimony was limited because the evidence was clear that defendant was under 17 at the time of that alleged offense, and the jury was instructed not to convict defendant

for conduct occurring before defendant's 17th birthday. We are not convinced that the outcome of defendant's case would have been different if defense counsel had objected to the hearsay, so defendant has not met his burden of proving that he was denied the effective assistance of counsel.

## III. LIFETIME REGISTRATION UNDER SORA

Defendant argues that the 2021 SORA is unconstitutional both on its face and as applied to him because its lifetime registration requirement for Tier III offenders constitutes cruel or unusual punishment. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews de novo constitutional issues and questions of statutory interpretation." *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). "Statutes are presumed to be constitutional unless their unconstitutionality is readily apparent. A party challenging the constitutionality of a statute has the burden of proving its unconstitutionality." *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004) (citation omitted).

But defendant failed to preserve this issue because he did not challenge the constitutionality of SORA at his sentencing. See *People v Jarrell*, 344 Mich App 464, 481; 1 NW3d 359 (2022). We review unpreserved issues for plain error, meaning that "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. CRUEL OR UNUSUAL PUNISHMENT

The United States Constitution prohibits "cruel and unusual" punishments, but the Michigan Constitution prohibits "cruel or unusual" punishments. US Const, Am VIII; Const 1963, art 1, § 16. Because our state constitution provides broader protections than the federal constitution, "if a sentence is constitutional under Michigan's standard, it is constitutional under the Eighth Amendment as well." *In re Harder*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 368645); slip op at 10. A party may challenge the constitutionality of a statute on its face or as applied to his case. *Jarrell*, 344 Mich App at 482. "A facial challenge involves a claim that there is no set of circumstances under which the enactment is constitutionally valid, while an as-applied challenge considers the specific application of a facially valid law to individual facts." *Id*. (quotation marks and citations omitted). Defendant raises a facial and as-applied challenge under both the Michigan and federal constitutions.

Because of his convictions, defendant was classified as a Tier III offender under SORA. MCL 28.722(u) and (v). Accordingly, he must register as a sex offender for life, which includes the publication of certain personal information on the online sex offender registry and significant reporting requirements to verify residence, employment, and contact information. See *id*. at 484 (listing several SORA registration requirements). While this appeal was pending, our Supreme Court determined that the 2021 SORA constitutes a punishment for all registrants, regardless of the crime that they committed. *People v Kardasz*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165008); slip op at 33. But that punishment is not cruel or unusual on its face, *id*. at ___; sip op at 34, so defendant's facial challenge to the constitutionality of the 2021 SORA fails.

To determine whether the 2021 SORA is cruel or unusual as applied to defendant, we must consider the following four factors to determine whether the punishment was grossly disproportionate: "(1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically rooted in Michigan's legal traditions." *Id.* at ___; slip op at 33. In *Kardasz*, the defendant was convicted of CSC-I for the sexual assault of his five-year-old daughter, and our Supreme Court concluded that lifetime registration was not grossly disproportionate as applied to him. *Id.* at ___; slip op at 34, 42.

Regarding the first factor, the *Kardasz* Court noted that lifetime registration was "a relatively moderate punishment" for "particularly grave offenses." *Id.* at ___; slip op at 35. It acknowledged that the severity of the sentence "may increase over time, such as for Tier III offenders who have lived offense-free for decades," but the defendant "was recently incarcerated and [had] not presented evidence of his individual risk of reoffending." *Id.* Defendant in this case was also recently incarcerated. Although he presented evidence at sentencing that his risk of recidivism was "below average," the gravity of his offenses makes his punishment just as, if not more, proportionate than in *Kardasz*. Rather than one offense against one victim, defendant committed several sexual offenses against four victims under circumstances that the trial court described as "ongoing abuse" in which defendant "took advantage of people who no one would believe." Despite his low risk of recidivism, we conclude that this factor does not support a finding that the 2021 SORA was disproportionately severe to the gravity of defendant's offenses.

For the second factor, the *Kardasz* Court compared the lifetime registration requirement for Tier III offenders to the punishments imposed for the less severe offenses under Tiers I and II, as well as the punishments for grave, nonsexual offenses such as second-degree murder, terrorism, and torture. *Id.* at ___; slip op at 37. It concluded that the second factor did not favor a finding of disproportionality, especially because the defendant's CSC-I conviction was "the most elevated Tier III offense." *Id.* Defendant was convicted of the same offense, along with several other registrable offenses. So, we similarly conclude that the second factor does not favor a finding that a punishment of lifetime registration under the 2021 SORA is excessive compared to comparable offenses in the same jurisdiction.

The *Kardasz* Court concluded that the third factor did not favor a finding of disproportionality, but that the fourth factor did favor such a finding. *Id.* at ___; slip op at 40-41. Defendant has not presented any unique circumstances that would cause our analysis of these factors, in an as-applied challenge, to be different. Because we reach the same conclusions as the *Kardasz* Court for each factor, we are bound to reach the same conclusion: the 2021 SORA's lifetime registration requirement was not grossly disproportionate and did not constitute cruel or unusual punishment as applied to defendant. Because defendant's argument fails under the Michigan Constitution, it necessarily fails under the narrower protections of the United States Constitution. See *id.* at ___; slip op at 42.

## IV. LIFETIME ELECTRONIC MONITORING

Defendant also challenges the constitutionality of MCL 750.520n on the basis that LEM is cruel or unusual punishment. We disagree.

-8-

## A. STANDARD OF REVIEW

Defendant also failed to challenge the constitutionality of LEM at his sentencing, so we review this unpreserved issue for plain error affecting substantial rights. See *Carines*, 460 Mich at 763. Constitutional issues are reviewed de novo. *Wiley*, 324 Mich App at 150.

## B. CRUEL OR UNUSUAL PUNISHMENT

Defendant was sentenced to LEM because he was convicted of CSC-I and CSC-II against victims who were under 13 years old. MCL 750.520n(1). Failure to maintain the electronic monitor in working order, to notify the department of corrections that the device is damaged, or to reimburse the department of corrections for the cost of the monitoring is a felony. MCL 750.520n(2). Our Supreme Court has recognized LEM as a punishment. *People v Cole*, 491 Mich 325, 336; 817 NW2d 497 (2012). And after considering the factors relevant to gross disproportionality, this Court determined that LEM is not cruel or unusual punishment on its face. *People v Hallak*, 310 Mich App 555, 577; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016). We are bound by that decision, MCR 7.215(C)(2), so defendant's facial challenge to LEM necessarily fails.[1]

In *Hallak*, the defendant was subject to LEM because of his conviction of CSC-II against a 12-year-old victim. *Id*. at 559-560. Against other victims, he was also convicted of CSC-III and six counts of CSC-IV. *Id*. at 560. The trial court noted that "[a]lthough he had no prior record, there was evidence of improper sexual acts involving 13 women or children. Such evidence suggests that lifetime monitoring would help to protect victims from defendant, who in turn would likely be deterred from engaging in such acts if he were closely monitored." *Id*. at 576-577. Under those circumstances, LEM was not cruel or unusual punishment as applied to that defendant. *Id*.

We similarly conclude that LEM is not cruel or unusual punishment as applied to defendant in this case. The severity of defendant's offenses was not different enough from the defendant in *Hallak* to justify a different conclusion. Defendant was convicted of *four* offenses that would each require LEM individually,[2] along with three other sexual offenses. There were four victims, and the testimony asserted that there were improper sexual acts involving two additional family members. Given the severity of this case, the assessment of defendant as presenting a below-average risk of recidivism does not mandate a less severe punishment. Accordingly, we hold that LEM was not a grossly disproportionate sentence as applied to defendant. Because LEM, both on

---

[1] Defendant argues that we should reconsider *Hallak*, but we decline to do so. We have continued to follow and affirm *Hallak* as recently as last year. *People v Jordan*, unpublished per curiam opinion of the Court of Appeals, issued September 5, 2025 (Docket No. 365997), p 11. Additionally, our Supreme Court has recently granted an application for leave to appeal a case that also raises the question whether LEM is cruel or unusual punishment or an unreasonable search. *People v Ringle*, 28 NW3d 725 (Mich, 2025). We are bound by our precedent, and we will leave it to our Supreme Court to further address the constitutionality of LEM.

[2] Testimony at trial indicated that JW was under 13 years old at the time of the CSC-I offense and that IT was under 13 years old at the time of all three CSC-II offenses.

its face and as applied to defendant, is not cruel or unusual punishment under the Michigan Constitution, it necessarily is not cruel *and* unusual punishment under the United States Constitution. See *id*. at 569.

## C. UNREASONABLE SEARCH

Defendant also argues that LEM constitutes an unreasonable search under the Michigan and United States constitutions. We disagree.

Both the United States Constitution and the Michigan Constitution prohibit unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Article 1, § 11 generally provides the same protection as the Fourth Amendment. *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991). The use of a Global Positioning System (GPS) tracking device to track the location of a sex offender is a search under the Fourth Amendment. *Grady v North Carolina*, 575 US 206, 307, 310; 135 S Ct 1368; 191 L Ed 2d 459 (2015). Accordingly, the use of LEM in Michigan is also a search. *Hallak*, 310 Mich App at 579. "But, as the *Grady* Court also noted, that conclusion does not end the Fourth Amendment inquiry, as the Fourth Amendment only precludes *unreasonable* searches." *Id*.

In *Hallak*, we balanced the public interests of punishing and deterring child sex offenders and protecting children with the invasion of the defendant's privacy interests. *Id*. at 580-581. We concluded that although "it may certainly be that such monitoring of a law abiding citizen would be unreasonable, on balance the strong public interest in the benefit of monitoring those convicted of CSC-II against a child under the age of 13 outweighs any minimal impact on defendant's reduced privacy interests." *Id*. at 581. Again, we are bound by *Hallak*, MCR 7.215(C)(2), so defendant's Fourth Amendment challenge necessarily fails. See also *People v Kardasz*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2022 (Docket No. 358780), p 3 (applying *Hallak* to reach the same conclusion).[3]

## V. CONCLUSION

In summary, defendant's arguments all lack merit. He was not denied the effective assistance of counsel because he himself made the informed decision to stipulate to the prosecutor's other-acts evidence, and his defense counsel's decision not to object to certain hearsay was supported by sound trial strategy. Recent Supreme Court caselaw precludes defendant's argument that lifetime registration under the 2021 SORA constitutes cruel or unusual punishment.

---

[3] Our Supreme Court denied Kardasz's application for leave to appeal issues regarding the constitutionality of LEM. *Kardasz*, ___ Mich at ___; slip op at 4.

And our previous decision in *Hallak* precludes his argument that LEM is either cruel or unusual punishment or an unreasonable search.

       Affirmed.


       /s/ Christopher M. Trebilcock
       /s/ Mark T. Boonstra
       /s/ Anica Letica